## LYDIA BARNARD v. THE STATE.

### No. 2478. Decided April 22, 1903.

**1.—Impeachment of One's Witness.**

Under article 795, Code of Criminal Procedure, a party may attack his own witness in any other manner, except by proving the witness' bad character, where his witness had made statements injurious to his cause. Held, that where the prosecutrix testified that she had been shot accidentally by defendant, she could not be impeached by her testimony before the grand jury, which she admitted she had given, to the effect that she was unmarried, but was being kept by one F.; that she was shot by defendant because defendant was jealous of F.'s attentions to her.

**2.—Impeachment of Witness.**

If a witness, on cross-examination, admits having made a contradictory statement to the one she testifies to, such admission is absolutely conclusive and can not be proved in the face of her admission.

**3.—Assault to Murder—Evidence.**

On a trial of a white woman for assault to murder a negro woman, while it was competent to prove that the parties lived on the farm of one F., and their relations to F., evidence that F. whipped people on his farm was not competent as tending to prove the jealousy of defendant against the negress by coupling defendant in the management of F.'s affairs on his farm, nor to prove illicit acts by and between the said F. and the negress.

**4.—Same—Opinion Evidence.**

On a trial for assault to murder, while a witness may state the relative position of the furniture, etc., in the room where the shooting occurred, it is inadmissible for him to give his opinion, from the position of the furniture, etc., in the room, that the prosecutrix was not accidentally shot as she testified she had been.

**5.—Same—Practice.**

When the opinion of a witness has been illegally admitted, defendant may avail of the error of its admission on motion for new trial, though he has made no motion to strike out, or requested a charge as to such illegal testimony.

Appeal from the District Court of Robertson. Tried below before Hon. J. C. Scott.

Appeal from a conviction of assault to murder; penalty, two years imprisonment in the penitentiary.

The essential facts are sufficiently stated in the opinion.

*Kinnard & Goodman,* for appellant.—Irrelevant testimony which is not pertinent or necessary to a proper explanation of any issue in the

trial of a case, and which is calculated to place the defendant in an improper light before the jury, and thereby injure him should not be admitted.

The State introduced Millie Jackson, the injured party, as a witness. She testified that the defendant did not shoot her, but that the gun fell and accidentally shot her, detailing just how the same occurred. The court then permitted counsel for the State to propound the following questions to the witness, and forced her to answer same: Q. Wasn't you before the grand jury? A. Yes. Q. Didn't you testify there that Mrs. Lydia Barnard shot you? A. I did tell that, but you kept pulling me around and scared me, and was going to carry me to jail, is the reason I said that; I first told you the gun fell and shot me. Q. You are under the power and influence of Joe Fulton, aren't you? A. No, sir. Q. What power has he got over you all out there, any way? A. I don't know, sir. Q. Millie, are you a married woman? A. No, sir. Q. How many children have you? A. Four. Q. What is their color? A. They are bright colored. Q. Who is the father of your children? A. I don't know, sir. Q. Isn't Joe Fulton their father? A. I don't know, sir. Q. Didn't you tell Mrs. Barnard that you had as much right to Joe Fulton as she did, and that you had been with him fifteen years and she only five? A. No, sir.

This evidence was certainly not admissible for any purpose, and could have no bearing whatever upon any issue in this case; it tended only to show supposed illicit acts by and between the witness and Joe Fulton who was also a State's witness, the defendant being in nowise connected therewith. Hines v. State, 37 Texas Crim. Rep., 339; Shamber v. State, 24 Texas Crim. App., 457; Chumley v. State, 20 Texas Crim. App., 547; Williams v. State, 13 Texas Crim. App., 514; Barker v. State, 26 S. W. Rep., 400; Crass v. State, 30 Texas Crim. App., 480; Monk v. State, 27 Texas Crim. App., 450; Fore v. State, 5 Texas Crim. App., 251.

The court erred in permitting the prosecuting attorney, over the objections of the defendant, to propound the questions to the State's witness Millie Jackson, and to require said witness to answer said questions. And the court further erred in permitting the prosecuting attorney to cause to be read in the presence and hearing of the jury what purported to be the testimony of the said witness Millie Jackson before the grand jury; which said purported testimony contained among other things the following: "Fulton has been keeping me for the past fifteen years and he is the father of my four children." For the reasons that said questions and answers related to no issue upon the trial of said cause, was upon an immaterial matter, and entirely foreign to any issue in the trial of said cause; and by the introduction of said purported testimony of said witness before the said grand jury, the prosecuting attorney was permitted to impeach his own witness upon wholly immaterial matter and in nowise connected with this cause, and which

tended to show the bad character of said witness Millie Jackson, which was calculated to and did prejudice the minds of the jury against this defendant. Rodriguez v. State, 23 Texas Crim. App., 503; McCrary v. State, 38 Texas Crim. Rep., 609; Self v. State, 28 Texas Crim. App., 398; Hines v. State, 37 Texas Crim. Rep., 339; Williams v. State, 24 Texas Crim. App., 637; Somerville v. State, 6 Texas Crim. App., 450.

*John E. Crawford,* also for appellant, filed an able argument upon the insufficiency of the evidence.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of an assault with intent to murder, and her punishment assessed at confinement in the penitentiary for a term of two years.

The record shows that appellant is a white woman, and that she made an assault upon a negress. By the third bill of exception, complaint is made that Millie Jackson was asked the following questions: "Are you a married woman?" To which she answered, "No." "How many children have you?" To which she answered, "Four." "What is the color of those children? Aren't they mulattoes?" To which she answered, "They are bright-colored." "Millie, who is the father of your children?" To which she answered, "I do not know." "Don't you know that Joe Fulton is the father of your children?" To which she answered, "I don't know." "Didn't you swear before the grand jury that Joe Fulton had been keeping you for fifteen years, and that he was the father of your children?" To which she replied, "I said it up there because I was scared. You had been pulling me around and threatened to put me in jail." To which questions and the answers defendant objected, which objections were overruled. State's counsel then called for the grand jury statement as made by witness, and was permitted to read said testimony of Millie Jackson, which contained, among other things, the following: "Fulton has been keeping me for the past fifteen years, and he is the father of my four children." To which defendant objected because said questions and answers related to no issue in the case, were upon an immaterial matter, entirely foreign to any issue; that by the introduction of the written testimony he was attempting to impeach his own witness upon immaterial matters, no way connected with the case, and which tended only to show bad character of Millie Jackson, and was calculated to prejudice and poison the minds of the jury against defendant. To this bill is appended the following explanation: "Witness had been shown to be hostile to the State, and testified upon the stand that she had shot herself accidentally, and then the State was permitted to ask if she didn't testify as

follows before the grand jury: 'Millie Jackson, being sworn, says: She was standing in her house last summer, about September, 1902, when Mrs. Barnard "came to my house with a gun and said she would kill me, and asked me what I was following Mr. Fulton for down at the well, and if I did not stay away from him she would fix me up. I was in the house, talking to her. I told her she had no right to shoot me about Fulton; that he was as much mine as he was hers. I was standing upon the floor with my hands down, had nothing in my hands and was doing nothing to her, was not trying to fight her, was not making any demonstration toward her, when she shot me. She brought the gun from her house, and took it back with her. I never had the gun at my house. When she shot me she ran off with the gun towards home. When I met Fulton, and told him Mrs. Barnard had shot me, I did not tell him that it was an accident. I did not tell him that the gun fell down and shot me. He asked me why I let her shoot me, and I told him I could not help myself, and he said it was awful bad, and I said I was going to make her pay for it. He said he would just let it alone, and not have anything to do with it; that it was just one of Mrs. Barnard's crazy spells. My girl, Lillie May, was present when I was shot, and I sent her to tell Mrs. Fulton that I was shot, and that Mrs. Barnard had shot me. Fulton has been keeping me for the past fifteen years, and he is the father of my four children," ' " etc.

The rule in reference to this question is clearly expressed in Blake v. State, 38 Texas Crim. Rep., 385, from which we quote as follows: "Article 795 of the Code of Criminal Procedure of 1895 provides: 'The rule that a party introducing a witness shall not attack his testimony is so far modified as that any party, when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner, except by proving the bad character of the witness.' At common law this could not be done unless the party was surprised by the testimony of his witness, or unless the party had been misled by a witness, and, when put upon the stand, testified, not in his favor, but against him. Our statute does not provide or require that the party must be surprised; but it is clear that, if the testimony of his witness is injurious to him, he can attack his testimony in any method other than proof of bad character. We are not to be understood as holding that where the party introduces a witness, knowing that the witness is going to testify against him, and without any reason to believe that the witness will testify in his favor, we would reverse the judgment because the party, under such state of facts, was deprived of the right of impeaching the witness by proof of contradictory statement. But in this case this witness, Stella McKenzie, had testified in the Harbolt case. She had sworn to facts which, if true, established an alibi for the defendant. Now, the defendant had a right to believe that she would not perjure herself by swearing to facts in conflict with those

already testified to; and this, although she may have told him that she would so testify. It frequently occurs that a witness will deny knowing anything about a fact or a case, making an effort not to be used as a witness, but, when placed upon the stand and sworn, tells the truth. Was appellant surprised? Being informed that she had deliberately sworn to facts sustaining his alibi, would he not have been surprised if she had sworn otherwise—especially to facts and circumstances disproving his alibi? We are of opinion that the court erred in not permitting this witness to be impeached." Now, reverting to the bill of exceptions under consideration, it appears from this and a previous bill, which we do not deem necessary to set out, that, at the time the State placed the witness on the stand, it had been apprised of the fact—perhaps, by her own statement—that she would swear that defendant shot her; and, after placing her on the stand and being sworn, under the Blake case, supra, the prosecuting attorney could presume that, having previously sworn in behalf of the State, she would still so swear, although she may have told State's counsel that she would not. However, the bill of exceptions before us shows that the witness did not deny making the statement imputed to her before the grand jury, but, on the contrary, with the utmost alacrity, admitted having done so. Then, for what purpose could this testimony have been introduced? We can conceive of none, except, as appellant insists, to prejudice her rights; that is, as a criminative fact against appellant, tending to show that she fired the shot at prosecuting witness and wounded her. This testimony was not admissible for that purpose. It is a well known rule that, if a witness on cross-examination admits having made a contradictory statement to that to which she is then testifying, such admission is absolutely conclusive, and can not be proved in the face of her admissions.

The State's witness Joe Fulton, while on the stand, was asked by the district attorney the following questions, over appellant's objections, to which witness replied, as stated: "How many acres of land do you own? A. 380 acres, mostly in cultivation. Don't Millie Jackson live on your place? A. Yes; she lives between my house and Mrs. Barnard's. How many children has she? A. Four. Don't Mrs. Lydia Barnard live on your place? A. Yes. Don't you whip people out there, and make them do as you please? A. They are free people. I don't whip and control them. What is the color of Millie Jackson's children? A. They are bright color." Appellant excepted to the asking of the questions, because illegal, irrelevant, and inadmissible; that said questions were remote and entirely foreign to any issue in the trial of Lydia Barnard for assault with intent to murder Millie Jackson; for the reason the same tended to couple defendant with witness Joe Fulton in the management of his affairs on his farm, and to develop illicit acts by and between State's witness Joe Fulton and Millie Jack-

son, and was thereby calculated to prejudice the rights of defendant before the jury. The court appends the following explanation: "It was shown that Joe Fulton was hostile to the State, and that witness Millie Jackson was under the influence of said witness, and also to show the condition on Fulton's farm, and the relation of the women to Fulton, to show the motive for the alleged assault." Of course, it is always permissible to prove motive for an assault, though frequently it is not necessary. It was also proper to show the condition of Fulton's farm, and the relation of the women to Fulton. But we do not understand this testimony comes within either of these rules. That Fulton whipped people on his farm would not indicate any motive on the part of appellant to shoot prosecuting witness, nor would it indicate the relationship appellant bore to witness or to prosecuting witness. We do not think this testimony was admissible.

The fifth bill complains of the introduction of the testimony of State's witness J. B. Dunn. This witness makes a long statement as to the condition and relative position of the bed, gun, and gun rack, and the hole in the wall where prosecuting witness had alleged the gun fell and was accidentally discharged. However, the proof shows that the bed and other furniture were not in the same position they were at the time prosecuting witness Millie Jackson claims to have been accidentally shot. This would merely go to the weight of the testimony, and not to its admissibility. This bill also shows that witness was permitted to state that, in his opinion, Millie Jackson could not have been shot accidentally in the manner testified by her. This was the issue to be tried by the jury, and the opinion of the witness would not be testimony. He can state the relative position of the furniture, gun rack, location of the house, and other matters, and then leave the jury to draw conclusions legitimately from the testimony. The opinion of the witness should not have been admitted.

The sixth bill complains of the introduction of Sims, who testified substantially as did Dunn, and also gave his opinion as to whether Millie Jackson could have been accidentally shot in the manner she claimed. The court states in his explanation to the bill: "Defendant did not ask to have the testimony stricken out, and did not request a charge upon same." This would not deprive appellant of the right to complain by bill and on motion for new trial of the admissibility of the illegal testimony. It was clearly inadmissible for the witness to give his opinion as indicated.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*