STATE OF NEW JERSEY, DEFENDANT IN ERROR, v.
MELROYAL BURRELL, PLAINTIFF IN ERROR.

Argued November 23, 1933—Decided February 2, 1934.

For the plaintiff in error, *J. Victor D'Aloia.*

For the state, *William A. Wachenfeld,* prosecutor of the pleas, and *Joseph E. Conlon,* assistant prosecutor of the pleas.

The opinion of the court was delivered by

TRENCHARD, J.  Melroyal Burrell, the plaintiff in error (hereafter called the defendant), was convicted in the Essex Oyer and Terminer of murder in the first degree without any recommendation of life imprisonment, on an indictment for the murder of Bella McCraw, and was sentenced to death. He brings up the entire record, and specifies causes for reversal, and also assigns errors on exceptions.

We deal first with defendant's contention that the verdict was against the weight of the evidence.

The state's evidence reasonably tended to show the following matters of fact:  The decedent lived in an apartment with her husband and four children, George, seventeen years of age; Florence, fifteen; Tessie, fourteen and another, an infant three years old.  For two years prior to the tragedy defendant lived with the family as a boarder.  Decedent's husband was steadily employed, but defendant had not worked for some months prior to the day of the killing, and was practically supported by the family.  Defendant from time to time had sexual intercourse with the decedent without her husband's knowledge.  Some time prior to the tragedy the situation became unbearable to the decedent and she wished to get rid of defendant and on one occasion she called the police.  This the defendant resented, having no money and no place to go, and he made up his mind to kill her.  After frequent quarrels there was a quarrel on the day of the tragedy.  Defendant locked the doors and terrorized the children, and by means of threats endeavored to get the children to distract the decedent's attention while he hit her with a monkey wrench.  Some of the children refused, but Florence, the adopted daughter, after first refusing, said that she would do what he wanted.  She engaged decedent's attention and the defendant approached with the monkey wrench in his hand and struck decedent on the back of the head.  She did not fall immediately and defendant grabbed her and threw her on the bed and got on top of her.  She was bleeding profusely and struggled desperately, but he "straddled her" and with his right hand on her throat he

choked her for "almost half an hour" until she was dead. Defendant then pulled down the window shades and, with the aid of the children, washed the blood from the walls and carpet, gave the rags and bed linen to George and instructed him to burn them in the yard; and George did burn some of them, and some were produced at the trial. Defendant gave George the monkey wrench and told him to hide it in the yard. George threw it in the alley and it was found by the police. Defendant took off his bloody shirt and gave it to George to burn, and put on a clean shirt. Then defendant went to a drug store and got alcohol with which he rubbed decedent's throat in an endeavor to remove evidence of strangulation. He changed the clothes of the decedent to remove the evidence of blood and violence. He arranged the head of decedent so that her chin rested on her chest. He then told the children, under a threat of death, that if anybody asked how she died they must say that a tall dark man knocked at the door, and that the decedent told him to come in, and she and he went into the bedroom, and later the man went out, and the children went into the room and found her dead. Thereafter defendant cut and filed his finger nails. When the husband returned from his work defendant told him that decedent died in a fainting spell. A physician was then called who examined the woman's heart and pronounced her dead and that she has been dead for four hours. Then the undertaker was called in and, finding evidence of violence, an autopsy was held at which it was determined that death had resulted from manual strangulation.

Such were the matters of facts which the jury, if they saw fit, could and no doubt did find.

The defendant gave various versions of the affair at different times, but his statement made to the police, which was admitted in evidence, confirmed many of the salient features of the state's case. That statement he made after being faced with the statements of the children as to the truth of the essential facts of the state's case, made by them as soon as they ascertained that the defendant was under arrest, and which they reiterated at the trial. The defendant at the trial,

while denying parts of his statement to the police, admitted that he had a quarrel with the decedent shortly before the tragedy. He admitted that he struck her in the head with a weapon. He testified that he did that because she had a pistol and threatened to shoot him. But the evidence taken as a whole clearly justified the jury in finding the fact to be otherwise, and that such threat, if any there was, had no relation whatsoever to the killing. Clearly the verdict was not against the weight of the evidence.

It is next said that there should be a reversal because the trial judge sustained the prosecutor's objection to the following question during the cross-examination of the state's witness, Dr. Bianchi: "Q. What did you say to the little girl and what did the little girl say to you in the presence of this defendant and her father at the house before or during or after you made the stethoscopic examination?"

We think not. The physician had testified that after the tragedy he was called in with the information that decedent had a fainting spell, and when he got there and examined her he found that she had been dead for about four hours. The question put to him on cross-examination by defendant's counsel we think was properly excluded. What the little girl said was not, nor was it contended to be, a part of the *res gestæ*. It may well be that what she said might have been asked by the state, but that was not done. No foundation had been laid for the impeachment of the girl, who indeed had not been called to testify. The question put by the defendant was properly excluded.

Such observations in effect dispose of other objections to the exclusion of somewhat similar questions, argued by the defendant under his points 2, 6 and 9.

The next point is that the judgment should be reversed "because the trial court permitted the prosecutor to introduce in evidence two photographs."

Not so. The photographs were of the body of the decedent, and were proved to be correct representations. They were taken shortly after death and before the autopsy. They were offered to show the actual marks and bruises on the decedent's

throat in support of the state's theory that she had been choked to death by a man's hand.

The argument against the admission of the photographs is that they served "to prejudice the minds of the jury against the defendant." That contention, if true in point of fact, is ill founded in point of law. The photographs were offered in support of the charge laid in the indictment. Assuming that they tended to prejudice the minds of the jury, that does not render their admission illegal. They tended to prove a material fact, without which the state would be unable to support the charge laid in the indictment. *State* v. *Aeschbach,* 107 *N. J. L.* 433; *State* v. *Fiore,* 94 *Id.* 477; *State* v. *Fine,* 110 *Id.* 67; 164 *Atl. Rep.* 433.

It is next said that there should be a reversal "because the trial court sustained the prosecutor's objection to the following question, during the cross-examination of the state's witness, George McCraw: '*Q.* Do you remember that occasion where Mr. Burrell or Melroyal, as you call him, was going to leave the house and you began to cry and did not want your mother to permit him to leave the house?' "

Not so. The question related to a matter concerning which the witness had not been interrogated upon his direct examination, and its exclusion certainly was not error justifying reversal where, as here, no reason was stated to the court as to its competency.

The next reason for reversal stated is "because the trial court sustained the objection of the prosecutor to the following question, upon cross-examination of the state's witness, George McCraw: '*Q.* Now, you said that you saw the pistol a week before and it was a long time before the quarrel. What quarrel?' "

To this it is a sufficient answer to point out that here, certainly, there was no prejudicial error because later during the examination of the same witness he was permitted to testify to the matter sought to be proved. Of course a conviction in a murder case will not be reversed for an error in the exclusion of evidence which was not prejudicial to the defendant. *State* v. *Fuersten,* 103 *N. J. L.* 383; *State* v. *Scott,* 104 *Id.* 544.

It is said that there was error "because the trial court permitted the prosecutor to ask of the said state's witness, George McCraw, the following question, upon redirect examination: 'Q. George, why didn't you tell your father or your cousin or your relatives and the police that Burrell had killed your mother?' " and "because the trial court refused to strike out the answer."

Not so. George had knowledge of the killing and had admitted on cross-examination that he did not at once tell the people that came to the house, who did it. The state on redirect properly inquired, why not? The propriety of the question is manifest by the answer which was "because he [defendant] had us scared" and told us that if we said anything defendant would kill us. The question was proper and the court rightly refused to strike out the answer. *State* v. *Doro,* 103 *N. J. L.* 88.

It is said there was error "because the trial court sustained the prosecutor's objection to the following questions asked of the state's witness, Tessie McCraw, upon recross-examination: 'Q. Is that the pistol which you saw in the hands of Burrell? Q. At the time the fight was on? Q. You don't know where he took it from?' "

But it appears the same witness had already answered responsively substantially the same questions put by the same counsel, and therefore the exclusion of the questions was not prejudicial error and will not lead to a reversal. *State* v. *Fuersten,* 103 *N. J. L.* 383.

Defendant contends that there was error in that "the trial court sustained the prosecutor's objection to the following question, asked of the state's witness, John McCraw, during the cross-examination: 'Q. Did any of your children tell you during all that time until the police came, that your wife had been choked to death by Melroyal?' "

But the record discloses the question was answered "no" before any objection was made, and no motion being made to strike it out, the answer was permitted to stand. The defendant not being prejudiced a reversal is not justified.

It is said that the judgment should be reversed "because

the trial court did not permit the following questions to be asked of the defendant, Melroyal Burrell: '*Q.* How many people down at headquarters questioned you? *Q.* Did you tell the police down there in headquarters that there was a pistol used by Mrs. McCraw? *Q.* Did you tell them what you have told this jury? *Q.* Can you read very well? *Q.* How about writing? Can you write very well?' "

A sufficient answer to such contention is to say that substantially the same questions had already been answered by the witness, and certainly there was no prejudicial error.

It is next said that the judgment should be reversed because the trial court sustained the objection of the prosecutor to the questions asked of Dr. Hilton, a witness for the defense, designed to show that the decedent was irritable and excitable in 1931, two years prior to the killing.

We incline to think that the exclusion of the questions was within the discretion of the trial judge. But, however that may be, it is clear that their exclusion was not prejudicial to the defendant.

The next assignment of error and specification of cause (which are identical) to be considered are: "Because the trial court erred in improperly permitting the witness, Raffaelo Capodanno, a detective of the Newark police department, called in rebuttal, to reiterate the testimony of the state's witnesses, George McCraw, Tessie McCraw and Florence McCraw."

But such an assignment and specification are insufficient for the purpose of review.

In a criminal case brought up by writ of error, whether on bills of exceptions or under sections 136 and 137 of the Criminal Procedure act, or both as here, the assignments of error and causes for reversal should specifically point out the judicial error complained of (*State* v. *Bassone,* 109 *N. J. L.* 176; *State* v. *Blaine,* 104 *Id.* 325) and that these did not do. But apart from that our examination of the entire record disclosed that there was no prejudicial error in the examination in question.

It is next said that the judgment should be reversed "be-

cause the trial court admitted in evidence a statement alleged to have been made by the defendant to the police."

The statement was made to the police and was in writing and was signed by the defendant after it had been read to him, and after he had read it and had made a correction in it, and was properly admitted in evidence for the state over an objection that it did not contain all that he had said.

Lastly it is argued that the judgment should be reversed because the trial judge refused to charge certain requests.

We think not. A judgment in a murder case will not be reversed, because of refusal of requests to charge, where the principles of law therein, as here, were correctly and fully presented in the charge given. *State* v. *Grosso,* 107 *N. J. L.* 295.

The trial judge properly charged that the defendant must be presumed to be innocent of the crime charged until his guilt was proved beyond a reasonable doubt. He properly defined the degrees of crime embraced in the indictment, and the elements thereof, and as to the rule respecting self-defense. He properly defined reasonable doubt, and told the jury that the defendant was entitled to the benefit of a reaonable doubt both as to the question of whether or not he was guilty at all and as to the question of the degree of criminality, and having so charged he was not bound to reiterate those instructions in language chosen by the defendant. *State* v. *Genese,* 102 *N. J. L.* 134.

Where, as here, the trial judge has properly defined the degrees of crime embraced in the indictment, and the elements thereof, and the defense interposed, and has instructed the jury accurately as to the true rule of reasonable doubt and that it applies to the whole case and to each of the crimes embraced in the indictment, he is not bound to charge that the jury must be convinced beyond a reasonable doubt of any one or more selected material facts constituting the crime nor to subdivide his instruction and charge separately as to each of the elements composing the crime. *State* v. *Heller,* 2 *N. J. Mis. R.* 1023; 126 *Atl. Rep.* 298. See, also, *Underhill on Criminal Evidence* 21, citing *Walker* v. *People,* 88 *N. Y.* 81.

The judgment will be affirmed.

*For affirmance*—THE CHANCELLOR, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 15.

*For reversal*—None.