# JAMES FORD (c) *v.* STATE OF MARYLAND

[No. 63, October Term, -952.]

*Decided January 13, 1943.*

The cause was argued before SLOAN, JOHNSON, DELA-PLAINE, COLLINS, MARBURY, and GRASON, JJ.

*Joel J. Hochman* and *Benson Gross* for the appellant.

*Robert E. Clapp, Jr., Assistant Attorney General,* and *Thomas N. Biddison, Assistant State's Attorney for Baltimore City,* with whom were *William C. Walsh, Attorney General,* and *J. Bernard Wells, State's Attorney for Baltimore City, and Bernard G. Peter, Assistant State's Attorney,* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

On March 31, 1942, an indictment was returned by the grand jury of Baltimore City charging James Ford with the following crimes committed upon the body of Mary Stewart at said city on the 22d day of March, 1941: First count, rape; second count, assault with intent to rape; third count, assault with intent to murder, and the fourth and last count, common assault. Upon his arraignment, Ford pleaded not guilty. A jury trial was waived and at his election he was tried before two judges. He was represented by counsel and went to trial on May 4, 1942, and the following day the judges found him guilty on the first and second counts in the indictment, not guilty on the third count. A motion for a new trial was filed, which was heard by the Supreme Bench of Baltimore City and overruled. On July 15, 1942, the court imposed its judgment that Ford be hanged, and from this judgment he appeals to this court.

Mrs. Mary Stewart, a white woman, lived with her husband and family at 33 East York Street. On the evening of March 22, 1942, she visited friends at 633 South Charles Street. She started for her home about

9.25 P. M. and was returning by way of Quay Alley in order to stop at a small confectionery shop conducted on that alley. As she was passing along the alley she was seized by a man. He grabbed her in such a way that she reclined and she could look her assailant in the face. So held, and with a hand over her mouth, this small woman, who weighed only ninety pounds, was dragged to a vacant lot. Along the way was a light, by which she could see her assailant was a colored man with a mustache. Beyond the light is a vacant lot, littered with bricks, lumber, and big pipes or mains. There he released his hand from her mouth, and she "hollered." Her assailant then picked up a brick and hit her on the head, rendering her unconscious. When she recovered consciousness she was inside one of these large mains and her assailant was on top of her. He told her to stay still, and fled. She crawled out of the main and sat on a pile of bricks. With the exception of her stockings, she was entirely nude. Her coat, which was evidently under her when she was assaulted, was taken by her as she dragged herself out of the main and with this coat she covered herself. She heard two young men crossing the lot and called to them for help. They carried her, together with her clothes, to her home, which was close to the scene of the assault; and shortly thereafter her clothes were turned over to the police.

Sergeant Kirwan had trouble that night in this neighborhood, which caused him to clear the block. He and Officer Lijewski saw Mrs. Stewart as she passed along the street shortly before the assault. He also saw Ford go into a saloon about that time. In September or October, 1941, two young white women reported a colored man entered their bedroom at night. They were unable to identify the man, but the sergeant suspected Ford. Ford was held at the station house, charged with disturbing the peace, and the sergeant talked with him. He told Ford that the ladies did not want to prosecute, and Ford then said to the sergeant that when he drank he had a

"yen" for white women. This evidence was elicited in answer to a question asked on cross-examination. The sergeant heard of this assault at 10.45 P. M. and went to the home of the victim immediately. "On the left side of her forehead was a terrible laceration, and blood was all over her face and hair." She gave a description of her asasilant. It fitted Ford, and with the sergeant's additional knowledge that Ford entered a saloon in the neighborhood shortly before the crime, and that when Ford was drinking he had a "yen" for white women, he and Officer Lijewski set out to find Ford. At 11.50 P. M. they found him. He said: "I ain't done nothing. I am not guilty of anything," and at "six o'clock I went to Goldfield Movie. I have just gotten out of there." There were "some blood stains on his coat and on the backs of his hands," which the sergeant saw with his flashlight. Ford was taken to the Southern Police Station and at 1.05 A. M., March 23, signed a statement in the presence of Lieutenant Koch, Sergeants Deal and Wietzel and Officer Mina. In this statement he said: "I met a white woman corner Sharp and Hill Streets about 10 or 10.30 P. M. on Sunday night, the woman's head was bleeding when I met her. She asked me if I would help her. I told her, lady I don't mind, but I was afraid of walking along the street with you I would get in trouble holding you up. She said that if I didn't she would holler murder, then we walked on down Sharp to York. We walked down York and crossed Charles Street and we walked into another dark alley. She told me if I didn't be with her, she would holler. When she lay down against something and pulled her clothes up, I ran, and came back up to Mike's Bar, and from there to Paul's Bar. That is when Doctor Thomas Pitts, the floor manager, at Paul's Bar, told me that the sergeant was looking for me. Then I went to look for the sergeant, and I met him at Hill and Charles Streets."

He said he had been drinking. When asked: "How did the blood get on your shirt and undergarments?" he

answered: "This woman fell against me, and when she fell up against me she held her head down and to keep her from falling I put my arm around her." He said he got the blood on his undergarments up town on Pennsylvania Avenue. This statement was offered in evidence. The defense objected to its admission, apparently on the ground that it was a confession of guilt by Ford. Before this statement (State's Exhibit No. 11) was offered by the State, and before it had closed its case, Ford was called and asked about the statement. He said, in substance, he signed a blank sheet of paper and the statement was thereafter typed above his signature; that he read the statement. The officers testified his verbal statement was taken down, typewritten and then signed by Ford. Explaining blood on his clothes, he testified he got it: "From a friend of mine named Floyd on Pennsylvania Avenue. I tied up his arm, that is how that blood got on the sleeve."

The court was correct in receiving in evidence this written statement by Ford. (State's Exhibit No. 11.) It was not a confession and does not admit guilt of the crime. "The distinction between a confession and an admission, as applied in criminal law, is not a technical refinement, but based upon the substantive differences of the character of the evidence educed from each. A confession is a direct acknowledgment of guilt on the part of the accused, and, by the very force of the definition, excludes an admission, which, of itself, as applied in criminal law, is a statement by the accused, direct or implied, of facts pertinent to the issue, and tending, in connection with proof of other facts, to prove his guilt, but of itself is insufficient to authorize a conviction." *State v. Guie*, 56 Mont. 485, 492, 186 P. 329, 331.

"Exculpatory statements, denying guilt, cannot be confessions. This ought to be plain enough, if legal terms are to have any meaning and if the spirit of the general principles is to be obeyed." "Guilty conduct, exculpatory statements and acknowledgments of subordi-

nate facts, colorless with reference to actual guilt," "fall without the meaning of the term confession."

Hence, an admission to having had an appointment with the deceased was held not a confession. So an admission to having been present at the place and time of the commission of a crime was held not to be a confession. When a person only admits certain facts from which the trier may not infer guilt, there is no confession. A confession of guilt is an admission of the criminal act itself, not an admission of a fact or circumstance which together with other facts warrant an inference of guilt. And the conduct of an accused in fabricating evidence falls without the rules regarding confessions.

A full treatment of this subject will be found in *Wigmore on Evidence*, 3d Ed., Vol. III, Sec. 821.

About 8.30 A. M. the same morning Ford was brought into the office of Captain Kriss. In the office at the time were Sergeants Kirwan and Deal. The statement (State's Exhibit No. 11) made by Ford was read to him by the captain. He said to Ford: "You would want me to believe that the lady was a prostitute and I don't believe it." "That lady was from a modest home, a good family, and she had five or six children." "If what you say here is not true, the woman * * ** through an ordeal probably she won't forget as long as she lives. Yet if you say this is true, at least be fair and try to shield her children. If the children would learn of such a charge, and yet not true, prevent some future reaction or a stigma on the family. I said Ford, do you know what I mean? He said, 'Yes, I do.' He said: 'Take that statement and destroy it and tear it up, and I will tell you the whole truth.' I said: If you want to tell me now from the beginning to the end, I will be glad to get it down, but you tell everything. I said: Is it true, first, whether or not this woman did solicit you or did as you stated here. (State's Exhibit No. 11.) He said:

'No.' Then he went in detail and I penciled notes briefly as he went on until he came to the point when he said he had been arrested."

When Ford said: "Take that statement (State's Exhibit No. 11) and destroy it and tear it up and I will tell you the whole truth," the captain turned the statement over and used it as a pad to take down Ford's confession. After the confession had been made, the captain sent for his typewriter and wrote up the confession, which was later offered in evidence as State's Exhibit No. 12. As he wrote on the typewriter he read from time to time to Ford, who invariably affirmed its truth. When it was finally typewritten a copy was given Ford and the captain read it back to him, he following the captain from the carbon copy given him. It was then signed. In the office at the time it was signed, in addition to those heretofore named, were Lieutenant Leineman and Frank G. Ellerman and Frederick Markoff. There is no evidence that this confession was obtained by any promise, hope, fear or inducement of any kind. On the contrary, the testimony is uncontradicted that it was not so obtained. It is objected to on the sole and only ground that because State's Exhibit No. 11 was not destroyed or torn up, the confession (State's Exhibit No. 12) was rendered inadmissible. Ford's confidence that the captain would destroy the statement was breached and hence it is urged the confession which followed was rendered inadmissible because of this breach of confidence. No cases were cited to support this contention, and we have been unable to discover any authority therefor. It has been held by this court that "an assurance of secrecy is regularly held insufficient to render a confession inadmissible on the ground that it is involuntary within the meaning of the rule." *Markley v. State*, 173 Md. 309, 317, 196 A. 95, 99.

Again referring to *Wigmore, supra,* Section 823, it is stated:

"A confession is not excluded because of any breach of confidence or of good faith which may thereby be involved. This has been accepted from the beginning."

* * * * *

"The true question seems to be: Does such confidence render it probable that the prisoner should be thus induced untruly to confess himself of a crime of which he is innocent?"

In Carey v. State, 155 Md. 474, at page 479, 142 A. 497, at page 499, it was said: " 'Was the situation produced by that evidence such that there was a reasonable probability that the accused would make a false statement' or confession? and this, as we have said, was the ultimate test to be applied in determining the admissibility of the statement, and, if it were found that there was no such reasonable probability, then the court was right in its ruling in admitting the statement."

It would seem to be inconceivable that Ford would make an untrue confession of guilt because of the failure of the captain to destroy an incriminating statement made by him not amounting to a confession of guilt. We are of the opinion that the record discloses nothing that was calculated to make the confession an untrue one. Whether a confession is admissible depends upon the facts and circumstances of each case, and cases cited by appellant's counsel differ on the facts from the case at bar. The case of Nicholson v. State, 38 Md. 140, 141, is cited. At page 153 of 38 Md., the court in that case said: "It is very clear upon all the authorities, that if the confession of the appellant had been induced by any threat of harm, or promise of worldly advantage * * * it ought to be excluded."

Here there were no threats or inducements at all, and we do not think that this authority, in the term "worldly advantage" there used, meant to exclude all confessions where the police have only committed a breach of faith. This confession (State's Exhibit No. 12) was correctly admitted in evidence.

The first bill of exception presents three exceptions to rulings on evidence. The prosecutrix was allowed to state that she was the mother of eight children; she was wearing earrings on the night in question and one of these earrings was found in the main or pipe where this assault took place. These exceptions were trivial and the court was correct in its rulings admitting this testimony. The coat the traverser wore on the night of the assault was identified by the prosecutrix. This was excepted to because it had not previously been shown where the coat had been gotten. It is perfectly plain from the record that the coat was on the man when arrested. He was wearing it when he entered the station house and it was held there until the date of the trial. The court was correct in overruling this objection.

There are four rulings presented in the second bill of exception. It appears that a sample of blood was taken from Mrs. Stewart by Dr. Maldeis and a sample of blood, purported to have been taken from Ford by Miss Kelly, together with the clothing of Mrs. Stewart and Ford, which they wore on the night of the assault, were taken to Dr. Maldeis for examination. Mrs. Stewart identified her clothing. The clothing of Ford was identified as his clothing. They were held at the station house from the time Ford was taken there shortly after this assault and taken by the officers to Dr. Maldeis. The sample of blood taken by Miss Kelly may be disregarded as the analysis of that specimen of blood by Dr. Maldeis was stricken from the testimony. It seems to us that the clothing that was examined by Dr. Maldeis was properly traced and as there was no objection to the qualification of Dr. Maldeis to make an examination of these clothes, his testimony in regard to the condition in which he found them was relevant and proper. The third objection was entered in connection with blood taken from Ford and as this was later stricken from the evidence it does not present reversible error. The fourth objection was to the refusal of the court to strike out all of the testimony of Dr. Maldeis. This ruling was correct.

The third bill of exception presents four rulings. While Sergeant Kirwan was testifying he was shown Ford's coat and asked: "Where are the blood stains on it?" and he answered: "One here (indicating) and one on the sleeve (indicating)." This question was deliberately asked and deliberately answered and the objection to this testimony came too late. The basis for the objection was directed at the blood stains on the coat. Thereafter Ford, when called to testify, was asked by his counsel about blood on his clothes. He stated that he had gotten the blood on his sleeve when he tied up an arm of a friend of his. Another objection to the testimony was that it was not shown that the condition of the blood on the coat at the time this testimony was given was in the same condition as it was at the time it was discovered on the night of the assault. The case of *Blake v. State,* 157 Md. 75, 145 A. 185, is cited as an authority to sustain this contention. In that case the prosecutrix was assaulted in a woods and weeds and burrs which were on the coat were admitted in evidence. It was held there that it should have been shown that the weeds and burrs were on the coat when it was first received by the police and that no change had been made in the coat from the time it was taken into possession by the police until it was offered in evidence. We think there is a difference between weeds and burrs and blood stains. It could hardly be said that because blood stains might have faded between the time of the commission of an offence and the time the article on which the stains appeared were offered in evidence would render the article inadmissible. There was no error in this ruling. The second ruling concerned the sample of blood taken from Ford by Miss Kelly and for reasons already stated it need not be discussed. The third exception was to the testimony of Sergeant Kirwan that he took Mrs. Stewart's clothing to Dr. Maldeis. This was objected to and overruled. The ruling was correct. The fourth exception was taken to the court's sustaining objection

to a question by counsel for traverser regarding the procedure of the police department. This ruling was correct.

The fourth bill of exception is directed against the admissibility in evidence of State's Exhibit No. 11, which we have heretofore considered.

The fifth bill of exception was taken to the court's action in overruling counsel for traverser who sought to halt Lieutenant Leineman when he considered the answer to his question was not responsive. Undoubtedly the answer was not responsive, but inasmuch as practically the same testimony was given by Captain Kriss, we do not consider this ruling reversible error.

The sixth bill of exception presents eight rulings. The first five rulings were taken in connection with testimony concerning the obtention of the confession (States Exhibit No. 12) which we have already considered. The sixth and seventh rulings may be considered together. On Wednesday following this assault Mrs. Stewart was released from the hospital and taken to the police station. Captain Kriss, on re-direct examination, was asked to tell the court what happened that day when Mrs. Stewart and Ford and the captain were together. There was no objection to this and after the question was fully answered Mr. Hochman asked the witness: "Are you reading the statement or testifying from your memory?" The witness: "I am telling you what they had said during the time I read the statement during the time interrupted, the various times." Mr. Hochman then noted an objection which was overruled, to which an exception was taken. After this exception was taken the State asked: "I don't want you to give what Mrs. Stewart said at that time. Did Ford make any further statement at that time?" There was no objection to this question and after it was fully answered Mr. Hochman noted an exception. This exception came too late, but even if this was not so, as the testimony objected to was a repetition of part of the prisoner's confession, this ruling of the court, even if erroneous, does not present reversible

error. The eighth and last exception was taken to the overruling of the court's action in admitting in evidence the clothes of Mrs. Stewart and Jámes Ford. There was no error in this ruling.

The crime was committed Sunday night. On Monday night following, Mr. Hochman, with a colored man who roomed with Ford, appeared at the station house where Ford was confined and requested to see him. The captain had given orders not to let anyone see Ford. Notwithstanding the officer in charge asked Ford on two occasions if he desired to see the attorney, and Ford replied in the negative. Thereafter Mr. Hochman was retained in the case. He complains that Ford was denied counsel. No testimony was offered to contradict the officer that Ford did not want to see the attorney when he first called at the station house and as there is a total absence of evidence that Ford's rights were in any way prejudiced because Mr. Hochman did not see him that night, we regard the matter as immaterial.

We call attention to what Judge Collins said in *Clawns v. State,* 179 Md. 644, at page 647, 22 A. 2d 464, at page 466; "In this case there is but one bill of exception which contains three separate rulings on evidence, one of which has been abandoned by the appellant on appeal, and this court has repeatedly refused to consider such exceptions when thus presented." This admonition was not heeded in the case at bar and, but for the seriousness of this case, these exceptions would not have been considered. Following the precedent set in the case of *Deems v. State,* 127 Md. 624, 96 A. 878, we have considered all of the rulings and we find that there was no reversible error committed by the trial court. The judgment in this case will, therefore, be affirmed.

*Judgment affirmed, with costs.*