CHISLEY *v.* STATE

[No. 106, October Term, 1952.]

90

*Decided March 20, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Louis M. Strauss*, with whom was *Clarence L. Johnson* on the brief, for the appellant.

*Ambrose T. Hartman, Assistant Attorney General*, with whom were *Edward D. E. Rollins, Attorney General*, and *C. Osborne Duvall, State's Attorney for Anne Arundel County*, on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The appellant, John William Chisley, was indicted for murder of Richard Henry Contee. His pleas were: 1, that he was not guilty, and 2, that he was insane at the time of the commission of the offense. It is admitted that he was sane at the time of the trial. He was tried before a jury on September 5, 1952, about a month after his indictment. After the Court had refused a motion for a directed verdict at the close of the State's case, and at the conclusion of the whole case, the jury found the appellant sane at the time of the commission of the crime, sane then and guilty of murder in the first degree, without recommendation. The Court sentenced him to be hanged.

It is undisputed that John William Chisley shot and killed Richard Henry Contee on May 9, 1952 with two shots from a revolver, one in the head and one in the abdomen. The claim of Chisley is that there was no sufficient evidence of either first or second degree murder and the Court should have so ruled as a matter of law, leaving the jury to find a verdict of either manslaughter or not guilty. Also, it is claimed that there was prejudicial error in permitting cross examination of the accused which utilized questions and answers lifted *verbatim* from a confession which was refused admission in evidence because it was not complete.

The State contends that the lower Court and this Court may not rule as a matter of law on the sufficiency

of the evidence as to the degree of murder—on whether the evidence would sustain a conviction of first degree murder—saying that this must always be for the jury to determine. It urges the correctness of the rulings on the evidence and that there was evidence to sustain the verdict of the jury.

The motion of the appellant for a directed verdict is in two parts. "(1) That there is no evidence sufficient in law to justify his conviction of murder in the first degree, (2) That the evidence is insufficient in law to justify his conviction of murder in the second degree." As is said in *Yanch v. State,* 201 Md. 296, 300-301, 93 A. 2d 749, "Since the adoption of the amendment to the Maryland Constitution, Article 15, Section 5, effective December 1, 1950, we have the right and duty, when the question is properly submitted, as in the instant case, to pass upon the legal sufficiency of the evidence in a criminal case. . . This Court will not in a jury case pass upon the weight of the evidence or decide whether the State has proven its case beyond a reasonable doubt. If there is any proper evidence before the jury on which to sustain a conviction, the motion for a directed verdict will not be granted." *Shelton v. State,* 198 Md. 405, 84 A. 2d 76. The State agrees with this statement of the law and agrees that if there was no evidence whatever of murder, but only of a killing, which if it amounted to a crime, could be manslaughter only, the Court below and this Court could so rule. It contends, however, that if there is any evidence of murder, there can be no determination by the Court below or this Court, as a matter of law, that the evidence is insufficient to show first degree murder. Its argument is that although Sections 494-498 of Article 27 of the Maryland Code (1951 Ed.) divide the crime of murder into two classifications: murder in the first degree and murder in the second degree, as has been long held by this Court, this statutory classification left the common law crime of murder undisturbed and did not create a new crime. The purpose of the statutes, it is said, was a mitigation of punishment in less atroci-

ous murders. The State says that the question before the jury can be only whether the appellant committed the crime of murder. If it is found that he did, the jury under the statute, must determine the degree. On this premise, the State argues that the changes in criminal procedure which followed the amendment to Article XV, Section 5 of the Constitution, and which are controlled by the provisions of Section 700 of Article 27 of the Code (1951 Ed.) and Rule 5A of the Criminal Rules of Practice and Procedure do not apply to the determination of the degree of the crime. It quotes *Davis v. State,* 39 Md. 355 at page 374:

> " 'Murder' is here recognized as a general denomination, including offenses differing from each other in their degrees of atrocity, but not in their nature or kind; no attempt is made to explain or modify its meaning or abridge its range. Its common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed.
>
> "The mode of distinguishing its degrees is specially prescribed, by requiring the jury, if the person indicted for murder shall be *tried,* to 'ascertain in *their verdict* whether it be murder in the first or second degree,' or if the 'person be convicted by confession, the court shall proceed by examination of witnesses to determine the degree of the crime and to give sentence accordingly.' "

The State urges that in *Abbott v. State,* 188 Md. 310, 52 A. 2d 489, decided before the Court was given the power to pass on the sufficiency of the evidence, the Court recognized the validity of the holding in *Davis v. State.* The Court said in the *Abbott* case: "We find nothing in the language of Section 480 of Article 27 (now Section 499) Chapter 138, Acts of 1809, quoted above, to indicate an intention on the part of the Legis-

lature to make reviewable by this Court a finding of the trial court as to the degree of a crime". The State finds further support for its position in Pennsylvania decisions. Pennsylvania has a statute almost identical with Sections 494-499 of Article 27, providing that the jury shall ascertain the degree of murder. It cites *Commonwealth v. Foster*, 364 Pa. 288, 72 A. 2d 279, and *Commonwealth v. Gibbs*, 366 Pa. 182, 76 A. 2d 608.

We are persuaded that to accept the holding urged by the State would, in a most important particular defeat the intention of the Legislature and the people in amending the Constitution so that the Court may decide in criminal cases sufficiency of evidence as a matter of law, leaving other matters of law and all matters of fact to the jury. Under the established and unquestioned practice, the jury may return a verdict of manslaughter under a murder indictment. Article 27, Section 710 of the Code (1951 Ed.) ; *Bozman v. State*, 193 Md. 196, 66 A. 2d 401. The State concedes, as we think it must, that the Court may instruct an acquittal on the charge of murder, leaving the jury to find whether or not the accused is guilty of manslaughter or not guilty. It is true that technically manslaughter and murder are distinct crimes, yet, in substance, they are degrees of felonious homicide. Hochheimer, *On Crimes and Criminal Procedure*, Second Edition, Sec. 346. In substance, also, the difference between murder in the first degree and murder in the second degree is as great and as definitive as the difference between murder and manslaughter. It would produce a most unreasonable and unfortunate result to hold that the Court may instruct that there is no evidence of murder and yet cannot instruct that there is no evidence which would sustain a conviction of murder in the first degree. The difference in punishment between murder in the second degree and manslaughter is but a few years. The difference in punishment between murder in the first degree and murder in the second degree may often be the difference between death and life.

The language of the Constitutional Amendment, of the statute, (Section 700, Article 27 of the Code, 1951 Ed.) and of Rule 5A of the Rules of Criminal Procedure, in each case permits review by the Court as to whether the evidence is insufficient to sustain "conviction". The Code (1951 Ed.) in Section 500 of Article 27 sets forth the punishment for "every person *convicted* of murder in the first degree." In the following section, it establishes the punishment for "every person *convicted* of the crime of murder in the second degree". Section 502 says: "An offender, *on conviction,* may be sentenced to suffer death". In *Abbott v. State, supra,* the Court relied strongly on the settled law of Maryland "that this Court will not pass upon the legal sufficiency of evidence to convict in a criminal case". In speaking of the determination of the Court below as to the degree of murder, it then held this: "To the extent that the finding is one that would have been conclusive in the event of a jury trial, we think it should be equally conclusive where the determination rests with the trial court under the provisions of Section 636, Article 27, or Section 480 of Article 27 of the Code. These statutes were adopted in the same year, 1809, and have remained without substantial change. Insofar as they deal with different aspects of the same subject-matter, they are in *pari materia* and should be construed together". As we have noted, the premise of the *Abbott* case was that the Court cannot pass on the legal sufficiency of the evidence. Now that the Court may do so, the force of the *Abbott* case as a precedent that the Court may not determine the legal sufficiency of the evidence to sustain a conviction of first degree murder is unimpressive.

The Pennsylvania statute, which coincides with Sections 494-499 of Article 27 of the Code (1951 Ed.) contains provisions which are identical, as to the definition of the two degrees of murder and as to the duty of the Court and the jury in ascertaining which has been committed. This statute was the first to be passed in this country and most of the States have modelled their

law upon that of Pennsylvania. See *History of the Pennsylvania Murder Statute,* 97 Pa. Law Review 759; and *Hochheimer,* work cited, Sec. 347. The Pennsylvania decisions, relied on by the State, do not offer support for its position. The Pennsylvania Courts have long held that where there is any evidence to be submitted to the jury, the Court cannot direct the jury as to the degree, or exclude manslaughter from its consideration and cannot direct acquittal. The jury must be the judge where there are facts upon which it can base a decision. Nevertheless, where there are no facts which will permit or sustain a decision by the jury, the Pennsylvania Court may direct a verdict of acquittal. *Commonwealth v. Bardolph,* 326 Pa. 513, 192 A. 916; and *Commonwealth v. Benz,* 318 Pa. 465, 178 A. 390. The reiteration in the Pennsylvania cases relied on by the State, and in other similar cases, that the jury must decided the degree of murder comes where there is evidence to go to the jury and the Court has instructed as to first degree but has either altogether omitted reference to the possibility of a finding of second degree or of manslaughter, or has insufficiently stressed those possibilities; nevertheless, where there is a complete lack of evidence justifying the verdict of manslaughter, it has been held in Pennsylvania that it is not an error for the Court to fail to instruct on that point. *Commonwealth v. Yeager,* 329 Pa. 81, 196 A. 827. Pennsylvania holds, as does Maryland, (and as is generally held, *Warren on Homicide,* Perm. Ed. Vol. 1, Sec. 77-78) that a division of murder into first and second degree does not change its common law status as one crime. Nevertheless, the Pennsylvania statutes require the Court on a motion in arrest of judgment, or on appeal, to pass on the sufficiency of evidence as to the degree of murder involved. In *Commonwealth v. Blanchard,* 345 Pa. 289, 26 A. 2d 303, 306, 27 A. 2d 48, the Court noted that there, in homicide cases, the appellate court reviews the law and the evidence "to determine whether the ingredients necessary to constitute murder in the first

degree shall have been proved to exist" and if not, to reverse judgment and to send the case back for a new trial or enter proper judgment under the law and facts. In *Commonwealth v. Dorazio*, 365 Pa. 291, 74 A. 2d 125, 127, the Court held that, in reviewing a conviction of murder, "it is our duty to determine whether the degree or elements of murder in the specified degree are present; whether there is sufficient evidence from which the jury could find beyond a reasonable doubt that the degree of murder was committed by the accused". This was also stressed in *Commonwealth v. Carluccetti*, 369 Pa. 190, 85 A. 2d 391.

The law in many jurisdictions seems to be in accord. In *23 C. J. S., Criminal Law, Sec. 1156, page 695*, it is said that the Court must not impinge on the right of the jury to determine the degree of crime of which accused is guilty, and goes on to say, "the Court may, where the evidence warrants it, charge that the evidence shows that a crime of one of the specified grades or degrees has or has not been committed, and direct the jury, if they believe the evidence, to find accordingly". In *41 C. J. S., Homicide, Sec. 352*, page 118, it is said: "Whether there is legal sufficiency of evidence in support of a degree of the crime of which accused may be convicted which will warrant its submission to the jury is a question of law for the Court, and, where there is no evidence to support a particular degree of homicide, the Court should not submit that issue to the jury". See *Commonwealth v. Yeager, supra; Commonwealth v. Green*, 302 Mass. 547, 20 N. E. 2d 417; and *Kinard v. United States*, 68 App. D. C. 250, 96 Fed. 2d 522.

In *State v. Linville*, 148 Kan. 142, 79 P. 2d 869, 871, the accused was convicted of manslaughter in the second degree. The Court instructed the jury as to manslaughter in the second degree, manslaughter in the fourth degree, and simple assault. The Court said that the essential elements necessary to constitute the crime of manslaughter in the second degree were neither established by direct evidence nor by legitimate in-

ference. The Court held that: "As the evidence failed to support the charge of manslaughter in the second degree, we think it was error to instruct the jury as to that crime and to submit such issue to the jury". There was a similar ruling in *State v. Nelson,* 148 Minn. 285, 181 N. W. 850; and see *State v. McLeod,* 196 N. C. 542, 146 S. E. 409. In *Commonwealth v. Merrill,* (Mass.) 14 Gray 415, 77 Am. Dec., 336, the accused was indicted for assault with intent to rape and was found guilty. The Court said: " There was an entire absence of all. evidence of the use of force" and that the evidence would have supported only a finding of simple assault. It was held that the case should not have gone to the jury on the question of assault with the intent to rape. In *Devoy v. State,* 122 Wisc. 148, 99 N. W. 455, the appellate court said that the evidence was insufficient to establish the crime of rape and that the Court should have granted the motions of the accused to dismiss the case on this charge and have submitted the case to the jury on the counts supported by the evidence. See also *State v. Kelley,* 36 Wash. 2d 772, 220 P. 2d 342; *State v. Banks,* 48 Ind. 197; *State v. Hammonds,* 216 N. C. 67, 3 S. E. 2d 439; and *Commonwealth v. DiStasio,* 297 Mass. 347, 8 N. E. 2d 923, 113 A. L. R. 1133. In the latter case, the defendant was indicted with his father on the charge of murder and also as an accessory before the fact. The Court directed a verdict on the charge of murder, saying that if there was any guilt it was as an accessory before the fact.

We think that the criminal procedure in Maryland, established by the Constitution and the statutes and rules which have followed it, contemplates the power of the Court to direct a verdict where the evidence is entirely insufficient to go to the jury on the question of first degree murder. The Circuit Court of Appeals for the Seventh Circuit, in *Ex Parte United States,* 101 F. 2d 870-878, 131 A. L. R. 176, said: "The essence of legal power is to take the case away from the jury, where there is an insufficiency of evidence to sustain

a conviction". In *Webb v. State*, 201 Md. 158, 163, 93 A. 2d 80, 83, the Court decided that it need not consider whether, had death ensued, "the appellant could have been convicted of murder in the first degree for a 'wilful, deliberate and premeditated killing', or merely of another 'kind of murder' comprehended in the second degree". This assumption of the power of decision between the two kinds of murder is at least a hint of prophecy, although perhaps not made with full deliberation and premeditation, that if the occasion arose, the Court would hold it has the power and duty to review the evidence to see if it would sustain first degree murder. See also *Knowles v. State*, 192 Md. 664, 65 A. 2d 179; *Munshower v. State*, 56 Md. 514; and *13 Maryland Law Review*, 52, 62.

Since we must decide whether the jury should have passed on the issue of first degree murder, a recital of the essential testimony is necessary. On May 9, 1952, the night of the murder the father of the accused and two other men met him by chance in Bowie and drove him home in the car with them. The appellant had been drinking but did not seem to be drunk. He walked to the car in Bowie in his usual manner, although he seemed to sleep on the back seat during the drive back home. When the car arrived at the Chisley home, it was driven to within four or five feet of the back steps. The father got out of the car first, followed by his brother-in-law, William Shorter, who told him that he had dropped some cigarettes. The accused said they were his and Richard Contee, the victim, said they were not. The father testified: "That's all there was to it. He gets out the gun and shot him; there wasn't any argument to it." Both the father and William Shorter agree that more than one shot was fired. The father, after the first shot, had gone through the house and a considerable distance up a road when he heard a second, and, perhaps, a third shot. Shorter had gone around the corner of the house and some thirty or forty yards across a field, when he heard the gun go off again. He said "I don't

know how many [times]". The father, when asked whether his son drank, testified that he did and that when he drank heavily, "He don't act any too good. . . He is kinda disagreeable and cross."

There was testimony by Leon Thomas, a neighbor of the Chisleys, that he learned of the shooting from the appellant's mother. He walked over to the victim's car and found the accused sitting in it, attempting to start it, as it kept stalling. Thomas then discovered that Contee was dead, and he urged the accused not to drive off but to get out of the car to help him. Chisley made no reply, so Thomas reached in and turned off the ignition key. At that point, Chisley reached back in his hip pocket, pulled out his gun and said "Goddam it, don't tell me what to do." Thomas' appraisal of whether Chisley was drunk or sober was that he had "been drinking, * * * but that he didn't appear to be drunk." He also said that the appellant, when drinking, "used to act up terrible; he would cuss his mother and father out; his father was scared to death of him." Thomas added that he was scared to leave his house, adjoining that of the accused, on Sunday mornings, because Chisley would sit in the kitchen door and shoot his revolver.

The State Police testimony is that when Chisley was picked up on the night of the shooting, about midnight, he had been drinking and was staggering. They say: "He was incoherent; he couldn't make a very definite statement." This was several hours after the shooting. The State attempted to introduce a confession which had been given by the appellant on the afternoon of the day following the shooting. It is conceded that the statement was voluntarily made and was not induced by threats or promises of reward. It was reduced to writing, in question and answer form, and signed by the appellant after he had read it. In preliminary testimony as to the circumstances under which the confession had been given, it developed that there were some questions which had been omitted from the statement. The explanation was: "There may have been some that

would be irrelevant to it." The testimony was that no questions had been left out because Chisley did not know the answers. All of the questions were in there except one or two and these were left out, according to the testimony, because "they were not that important", either to the State or to the defendant. The Court sustained an objection to the admission of the confession on the ground that it was not a complete statement. After the rejection of the confession, Trooper Kuhns of the State Police, testified that Chisley had talked to him about ten o'clock on the morning following the shooting, and had said that he had had an argument with Contee and that he had shot him. He could not remember what the argument was about. Chisley then said that after the shooting, he had left and gone to Bowie to continue drinking. He had been drinking before the shooting in Bowie at the Railroad Inn and other places. He told Trooper Kuhns that he had come home from work with Contee, his father and some other man, and that he had shot Contee with a gun he had bought several months before in a hardware store in Bowie. Chisley also said, in this same conversation, that when he was leaving after the murder, someone tried to stop him and he pulled the gun out and pointed it at him and told him to go away and leave him alone. Chisley told the trooper that he had, together with some of his friends, drunk three pints of liquor before the shooting. He did not know the man he shot had died, until he was told by the police.

The appellant himself, on direct examination, testified that he got off from his work at Bowie race track about four o'clock on the day of May 9, 1952 and went to the Railroad Inn, where he bought a half pint and cold beer. He shared his whiskey with some of his pals and shared some of their whiskey. He did not remember getting home or who took him. He remembers nothing until after the shooting. Police told him the next morning that he had shot a man. He recalled seeing Leon Thomas as he was leaving the scene of the

shooting but he does not remember any more than what the Police said, "that the man was shot twice". Under cross-examination, Chisley admitted that the State Policeman did not write down anything more than he said, that he was shown the statement and read it, and that he signed it. A series of questions and answers from the statement was read to him, and he was asked if he remembered the answer. Consistently, he replied "Yes". The form of some of the questions made it difficult to tell whether in answering "yes", the witness was saying he remembered being asked the question and answering it, or whether he was saying that the facts stated in the question were correct. Objection was made on the ground that the questions and answers were in the confession which had been ruled out. The Court permitted the line of questioning on the ground that the witness, in his direct testimony, had said he did not remember matters and facts as to which he had given answers in the statement, and therefore, the cross-examination was proper. After some twenty questions from the statement, Chisley was asked whether anyone had talked to him about the facts before he gave his statement, and he replied that no one had, that no one had coached him or said he had better say this or that, and that the answers set down were exactly what he remembered. He was asked, "You remembered when you answered these questions exactly what had occurred, didn't you?", and he replied "Yes, sir." He was then asked if he knew what had happened the day before, and he replied he did. He was asked if he knew he had shot Contee and he replied that he did. When he was asked if he knew that he had argued about some cigarettes, he replied that he did not. He knew that he had had an argument of some sort but he did not know what it was about. He knew that he had shot Contee once but he did not know he had shot him any more than that. He knew that after he had shot Contee, he jumped into his car and he remembered Leon Thomas coming up to him, although he doesn't remember what he said.

He knows that when he got in the car, he drove down to Bowie to get his cigarettes out of Monroe Johnson's truck. He remembered running into a bank on the way and that the car worked nicely when he got it started. When he struck the bank, he started the car again and went on and got his cigarettes. When he got to Bowie, he remembered that he stopped at the store and bought another pint of liquor and went over to Railroad Inn and drank another bottle of beer. He was asked whether he had a dollar bill or two dollar bills when he paid for the whiskey, and he replied that he had three one dollar bills and he didn't remember how much change the man gave him but he does remember he bought Bourbon DeLuxe. He left the pint in the car and walked over to get some beer, but he was arrested before he had an opportunity to get it. Before he bought the liquor, he bought a bottle of Gunther's beer and remembered that he drank it out of a glass and that it was a warm glass rather than a chilled glass. He had planned to go back home later on. He had told one friend of his that he was going back home and that he wanted to give himself up, knowing that he had shot somebody. He was then asked if he told Monroe Johnson that he had shot Contee. He said he had but he doesn't remember telling him that he almost shot Leon Thomas. He was then asked, "But you do remember telling him you shot Contee, didn't you?" and his answer was "That's right." He was asked how far away he was when he shot Contee the first time. His answer was "I don't know." Asked again, he said, "he was about from me over to that bar there."

All this came in without objection. The Court then asked him: "Were you sitting in his car when the first shot was fired? A. No, sir, I was standing on the ground. (The Court). You were standing on the ground when the second shot was fired? A. Yes, sir."

There was no prejudice to the appellant in the cross-examination based on the questions and answers taken from the confession. Everything that was embraced

in or deducible from this cross-examination was revealed in the testimony of Trooper Kuhns, as to the statements made to him by Chisley the morning after the shooting. No objection was made to this testimony and the facts stated by the appellant were proper evidence as admissions, even if they did not amount to a confession. *Ford v. State,* 181 Md. 303, 29 A. 2d 833; *Delnegro v. State,* 198 Md. 80, 81 A. 2d 241; and *Curreri v. State,* 199 Md. 54, 85 A. 2d 454. Further, in view of the denials of remembrance in Chisley's direct testimony, it tested his credibility.

The appellant himself, in his testimony on cross-examination, unobjected to, and as to which there could be no sound objection, disclosed fully everything that was in the questions and answers complained of. It is not necessary then to decide whether the confession was properly excluded, although it may well be that it should have come in, with full right and opportunity to the defendant to supplement it if it was incomplete. *Newton v. State,* 147 Md. 71, 127 A, 123; *Walters v. State,* 156 Md. 240, 144 A. 252; *Gray v. State,* 181 Md. 439, 30 A. 2d 744; *Underhill, Criminal Evidence,* 4th Ed., Sec. 265, page 514, and Sec. 276, page 546; 2 *Wharton, Criminal Evidence,* Sec. 582, page 962; 1 *Greenleaf, Evidence,* Sec. 201 (as modifying an apparently contradictory statement in *Hochheimer,* Sec. 170); *State v. Burrell,* 112 N. J. L. 330, 170 A. 843; *State v. Adams,* 339 Mo. 926, 98 S. W. 2d 632, 108 A. L. R. 838; *Preston v. United States,* 65 App. D. C. 110, 80 Fed. 2d 702, and *Louette v. State,* 152 Fla. 495, 12 So. 2d 168.

On the evidence which the jury was entitled to consider, we find the Court below was not in error in submitting the issues of first and second decree murder. Felonious homicide is divided into two main classes—murder and manslaughter. Murder has been defined as the unlawful killing of a human being with malice aforethought; and manslaughter to be the unlawful killing of another without malice aforethought. *Hoch-*

*heimer,* work cited, Sec. 346; *Neusbaum v. State,* 156 Md. 149, 143 A. 872; and *Warren on Homicide,* Perm. Ed., Vol. 1, Sec. 63. The law presumes all homicides to be committed with malice aforethought and to constitute murder. The burden is on the accused to show circumstances of alleviation, excuse, or justification, which will reduce the offense to manslaughter. *Wharton's Criminal Law,* 12th Ed., Vol. 1, Sec. 419. Where the law divides murder into grades, such a homicide is presumed to be murder in the second degree and the burden is on the State to show that the killing was wilful, deliberate and premeditated, if the crime is to be elevated to first degree murder under *Section 494 of Article 27 of the Code* (1951 Ed.). *Hochheimer,* work cited, Sec. 347; *Lloyd v. Commonwealth,* 185 Va. 674, 40 S. E. 2d 258; *State v. Lamm,* 232 N. C. 402, 61 S. E. 2d 188; and *Commonwealth v. Robinson,* 305 Pa. 302, 157 A. 689.

The essential distinction between murder and manslaughter, therefore, is the presence or absence of malice. Malice has been defined, in this connection, as the intentional doing of a wrongful act to another without legal excuse or justification. It includes any wrongful act done wilfully or purposely. *Warren on Homicide,* Vol. 1, Sec. 66. This Court, in *Rosenberg v. State,* 164 Md. 473, 165 A. 306, said that "malicious" as used in an indictment, was descriptive of a wrongful act committed without legal justification. It has been held often that the inference of malice may be drawn from the fact of the use of a deadly weapon directed at a vital part of the body. At least, in the absence of circumstances disproving malice, that presumption arises from such a use. *Vaccaro v. Collier,* D. C. Cir., 38 Fed. 2d 862. The Court, in *Commonwealth v. Robinson, supra,* [305 Pa. 302, 157 A. 692] said: "The intentional, unlawful and fatal use of a deadly weapon against a vital part of the body gives rise to the presumption of fact that malice * * * existed." See also *Commonwealth v. Young,* 326 Mass. 597, 96 N. E. 2d 133; *Pitts v. State,* 216 Ind. 168,

23 N. E. 2d 673; and *State v. Hammonds*, 216 N. C. 67, 3 S. E. 2d 439, *supra*. There is no evidence in this case of provocation nor passion and no other evidence to overcome the presumption of a killing committed with intent, which is malice in law. That is to say, there is no basis on which the jury could properly have found a verdict of manslaughter. There was evidence in the case that would justify the jury finding, as they did, that the killing was wilful, deliberate and premeditated, as required by *Section 494 of Article 27 of the Code* (1951 Ed.) if it is to be first degree murder. As we shall see hereafter, in more detail, voluntary intoxication will not reduce murder to manslaughter nor will it excuse the crime. It must be considered by the jury as it bears on the questions of wilfulness, deliberation and premeditation on the part of the accused. *Hochheimer*, work cited, Sec. 347, p. 380, defines "wilful" as follows: "there must be a specific purpose and design to kill;" "deliberate" is defined: "there must be full and conscious knowledge of the purpose to do so;" and, "premeditated" as: "the design must have preceded the killing by an appreciable length of time, time enough to be deliberate. In order to justify a conviction of murder in the first degree, as thus defined, the jury must find the actual intent, the fully formed purpose to kill, with so much time for deliberation and premeditation as to convince them, that this purpose is not the immediate offspring of rashness and impetuous temper and that the mind has become fully conscious of its own design." It is not necessary that deliberation and premeditation shall have been conceived or have existed for any particular length of time before the killing. Their existence must be judged from the facts of the case. *Webb v. State, supra*. The Court of Appeals of New York, in *Leighton v. People*, 88 N. Y. 117, 120, put it in this wise: "If, therefore, the killing is not the instant effect of impulse, if there is hesitation or doubt to be overcome, a choice made as the result of thought, however short the struggle between the intention and

the act, it is sufficient to characterize the crime as deliberate and premeditated murder." .The same ruling is made in *People v. Majone,* 91 N. Y. 211, 212: "Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is." It is generally established and certainly is necessarily the law of Maryland, where the jury is the judge of the law and the facts, that where there is evidence to go to the jury, whether or not there was malice, wilfullness, deliberation and premeditation must be for the jury to determine. *Warren on Homicide,* Vol. 3, Sec. 307; and *Jones v. State,* 188 Md. 263, 272, 52 A. 2d 484. *Shelton v. State, supra.*

There remains only the effect of intoxication. *Warren on Homicide,* Vol. 1, Sec. 61, says this: "The general rule of criminal law that voluntary drunkenness is no excuse for crime applies to homicide. . . Where murder is divided into degrees, the fact of drunkenness at the time of the homicide may be considered by the jury in determining the degree of murder. . . It is held that the mere fact that the accused was intoxicated is not sufficient to reduce the killing from murder to manslaughter." In *Hopt v. People,* 104 U. S. 631-635, 26 L. Ed. 873, the Supreme Court held that voluntary intoxication affords no excuse, justification or extenuation of a crime committed under its influence but that under a statute establishing different degrees of murder, the question of whether the accused was in such a condition of mind by reason of drunkenness, or otherwise to be capable of deliberation and premeditation, becomes a material subject of consideration by the jury. To the same effect are the majority of the cases in the country. See *State v. Kelly,* 216 N. C. 627, 6 S. E. 2d 533, 546; *Mack v. State,* 203 Ind. 355, 180 N. E. 279, 83 A. L. R. 1349; *People v. Rogers,* 18 N. Y. 9; *State v. Hammonds,* (N. C.),

supra; Commonwealth v. Jones, 355 Pa. 522, 50 A. 2d
317, 322; Commonwealth v. Simmons, 361 Pa. 391, 65
A. 2d 353; State v. Tansimore, 3 N. J. 516, 71 A. 2d
169, 176; Mergner v. U. S., 79 U. S. App. D. C. 373, 147
Fed. 2d 572; 12 A. L. R. 861; State v. Stenback, 78
Utah 350, 2 P. 2d 1050, 79 A. L. R. 897; and Wharton's
Criminal Law, work cited, Sec. 516. Spencer v. State,
69 Md. 28, 13 A. 809, and Taylor v. State, 187 Md. 306,
49 A. 2d 787, give indications that Maryland follows
the general rule. See also Fisher v. U. S., 328 U. S. 463,
66 S. Ct. 1318, 90 L. Ed. 1382. The evidence was sharply
conflicting as to the extent of Chisley's intoxication.
Certainly it was a matter for the jury to determine.
The jury was fully instructed by the Court in his charge
as to the necessity for considering the effect of intoxica-
tion on the formation and existence of wilfullness, de-
liberation and premeditation.

There was evidence, in our opinion, which the jury
could properly consider in determining whether there
was intent to kill and deliberation and premeditation.
The shooting was preceded by the discussion, brief as
it was, about the ownership of the cigarettes. The jury
could find that two or more shots were fired and that
there was an appreciable interval between the first shot
and the second, or more, and that the second was fired
as Contee lay on the ground; the firing of two or more
shots in such circumstances has been held by the Courts
to be evidence for the jury of deliberation and pre-
meditation. State v. McNamara, 116 N. J. L. 497, 184
A. 797, 185 A. 479; People v. Harris, 209 N. Y. 70, 102
N. E. 546; Commonwealth v. Dreher, 274 Pa. 325, 118
A. 215; and Brown v. State, 62 N. J. L. 666, 42 A. 811.
The jury could have considered and acted upon a finding
that the appellant, when he pulled the pistol from his
pocket and threatened to shoot Leon Thomas, and then
decided that he would not, was acting just as he had
not acted in his attack on the deceased and that delibera-
tion and premeditation had resulted in his choice to kill.
Commonwealth v. Gidaro, 363 Pa. 472, 70 A. 2d 359;

*State v. Pierce,* 4 N. J. 252, 72 A. 2d 305; and *State v. Hammonds,* 216 N. C. 67, 3 S. E. 2d 439, 445, *supra.* Evidence of the movements and actions of the accused after the killing and before the arrest may be competent evidence. *McCleary v. State,* 122 Md. 394, 89 A. 1100; and *Cothron v. State,* 138 Md. 101, 110, 113 A. 620.

We think that there was evidence which justified submission to the jury as to whether or not there was murder in the first or second degree, and that the jury was properly instructed as to the law, under the facts of the case.

*Judgment affirmed.*