## BRUCE *v.* STATE

[No. 11, September Term, 1958.]

*Decided October 28, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Richard M. Pollitt,* with whom was *Vaughn E. Richardson* on the brief, for the appellant.

*Stedman Prescott, Jr., Deputy Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *Hamilton P. Fox, Jr., State's Attorney for Wicomico County,* on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

This is an appeal by Robert Douglas Bruce (the defendant) from the judgment and sentence of the Circuit Court for Wicomico County entered on the verdict of the jury that the defendant was guilty of manslaughter.

On Sunday, December 1, 1957, the defendant, a seventeen year old youth, worked at the Spur Gasoline Station on East Main Street in Salisbury. During the early evening Noland Willey (the deceased), in company with other youths, went to the filling station to get some change for the proprietor of

a drug store on Church Street, known as "The Spot." While there the defendant and the deceased had an argument concerning an uncomplimentary remark the defendant had allegedly made to a girl about the deceased. The deceased, having ascertained when the defendant would be through work, told him he would be back. Ostensibly it was understood they would go together to see the girl and settle whether the defendant had called the deceased an "s.o.b." After the deceased left the filling station the first time, the defendant, who testified he was "scared" of the deceased, attempted unsuccessfully to telephone his step-father, and, when he could not reach him, talked to a younger brother and asked his brother to meet him after work.

Several hours later, at approximately 10:30 p.m., three automobiles packed with teen-age boys and girls, including the defendant's brother and a sister, arrived across the street from the filling station. Upon arrival the sister approached another of the automobiles and talked to the occupants. As one of the boys present walked by she called him a name and he slapped her. The deceased got into the altercation, knocked the boy down and kicked him about the head. The defendant, who was still working, seeing the disturbance, went to his automobile parked at the filling station, took a 25-caliber pistol from the trunk, put it in his pocket and approached the scene of the fracas. Although he testified he was afraid of the deceased and showed it, according to some of the witnesses, the defendant told the deceased he had a gun and ordered him to stop kicking the other boy. The fight ended when the defendant reminded the deceased his quarrel was with him, not the other boy. The deceased, who was sixteen, was tall and weighed 210 pounds. The defendant was small and weighed 135 pounds.

At the suggestion of the deceased, he and the defendant, and the occupants of the three automobiles, then proceeded to the vicinity of the home of the girl who had allegedly told the deceased the defendant had called him a name. Each was armed, the defendant with the pistol, and the deceased with a dagger-type knife in his right coat pocket. Upon going to the door of the girl's home, the boys were told by her father

to leave. They were returning to their respective automobiles parked in the vicinity some distance from the girl's home when the fatal fracas between them occurred.

All of the witnesses agree that the deceased and the defendant appeared to be walking in a friendly manner, but just as they arrived at a point under the street light at the corner of Locust Street and Locust Terrace, the deceased "jumped" the defendant, grabbed him and tried to seize the pistol which was in the defendant's right coat pocket. There is some conflict as to what followed in the scuffle. Some of the witnesses testified they saw the pistol; one testified he saw the knife in the deceased's hand; others testified they saw both. But it is not disputed the defendant had the pistol and the deceased had the knife. The knife was found by the police on the pavement near the right hand of the deceased. When the deceased attacked the defendant, the defendant struck him at least twice with his left hand, causing the deceased to step back. When the deceased lunged at the defendant again, the defendant fired the pistol. The deceased fell, and apparently died instantly.

The defendant ran to the automobiles and told the occupants to leave. The defendant left the scene immediately, stopped to pick up part of his pay and his automobile at the filling station, went home for a short time, and then fled to hide out at a farm house near Bryan's Manor. He still had the pistol in his possession when he was picked up by the police, but he had thrown the clip down the farm-house well.

The defendant was indicted for the murder of Noland Willey on December 12, 1957.

On the first day of the trial, Jimmie Lee Davis was called as a witness by the State. His testimony was for the most part favorable to the defendant, and he specifically testified that the deceased had a knife. On the second day of the trial, over the objection of the defendant, the witness was recalled and his testimony of the previous day was impeached by the State by cross-examination of the witness and by the testimony of Trooper Robert D. Weir to the effect that on the night of the killing the witness had made inconsistent statements to the trooper. When first interrogated, at ap-

proximately 11:30 p.m. on December 1, 1957, the night of the killing, the witness denied having seen the defendant after three o'clock in the afternoon of that day. Subsequently, about an hour later, at 12:30 a.m. on December 2, 1957, the same night, he informed the trooper he was a witness to the killing and had seen the deceased "pull a knife." The defendant contends the court erred in allowing the State to impeach its own witness and by allowing the trooper to testify as to the prior inconsistent statements when he had already admitted making such statements. The State admits that the State's Attorney *attempted* to impeach its own witness by cross-examination at a time when the State was not surprised by the testimony of the witness, but claims such cross-examination and the subsequent testimony of the trooper did not *in fact* impeach the witness. The State contends such action, instead of being prejudicial to the defendant, was prejudicial to the State, and that no harm was done to the defendant.

At the close of the evidence, the defendant filed six written prayers and requested the court to instruct the jury on the law as set forth in such prayers with respect to the law of self-defense. The court advised counsel it refused the prayers as presented, but would endeavor to substitute an oral instruction in their place and stead at the conclusion of the arguments. However, the record shows the court did not afford the parties an opportunity to object to the instructions *before* the jury retired to consider its verdict. Instead the court informed the parties, if there were any exceptions, they could dictate them to the court reporter *after* the jury retired. The defendant objected to the failure of the court to include in its instructions the law set forth in his prayers, but he neglected to state distinctly the omissions to which he objected and the specific grounds for his objection. He further objected to the court's definition of malice on the ground it was not applicable where self-defense was an issue. Three days later the defendant requested leave of the court "to note additional exceptions to the instructions after the jury had retired concerning the contradictory charge as to the burden of proof." The State objected and the court refused to allow additional objections. The defendant contends the court

erred in its instructions to the jury. The State, conversely, maintains the court did not commit any prejudicial error.

It was error for the trial court to permit the State to impeach its own witness, and such impeachment was prejudicial. The State admits in its brief that the State's Attorney attempted to impeach its own witness, but maintains such action was not prejudicial because the testimony adduced was favorable to the defendant. The action of the court in allowing the impeachment at all under the circumstances in this case, and particularly by allowing the trooper to testify as to the prior inconsistent statements, was prejudicial. Although many law writers severely criticize the rule and advocate its abolition,[1] the general rule is that a party may not impeach his own witness. See *B. & O. R. R. v. State, Use of Woodward,* 41 Md. 268 (1875). See also *Queen v. State,* 5 Harris & J. 232 (1821); *Franklin Bk. v. Steam Nav. Co.,* 11 Gill & J. 28 (1839); and *Proctor Electric Co. v. Zink,* 217 Md. 22, 141 A. 2d 721 (1958). There are, however, several well recognized exceptions to the rule. Many states have limited the rule by statute, and some courts have reached the same result without statute. In Maryland this Court has recognized an important exception to the rule with which we are presently concerned. Where the testimony of a witness constitutes a surprise to or an entrapment of the party who called him, the party so surprised may—with the permission of the trial court, which is normally granted—examine the witness for the purpose of eliciting the fact that the witness had made a prior statement inconsistent with his sworn testimony. If the witness admits it, that is generally an end of the matter. But, if he denies it, proof of such inconsistent statement may be shown by other witnesses. Proof is allowed, not for the purpose of discrediting the witness, but to contradict him and

---

1. See, for instance, McCormick, *Evidence* (1954), § 38; 3 Wigmore, *Evidence* (3d ed. 1940), § 896; Kauffman, *Impeachment and Rehabilitation of Witnesses in Maryland,* 7 Md. L. Rev. 118 (1943); Ladd, *Impeachment of One's Own Witness—New Developments,* 4 U. of Chi. L. Rev. 69 (1936). Cf. Casenote on *State Use of Chenoweth v. Balto. Contracting Co.,* entitled *Impeachment by a Party of his own Witness,* 4 Md. L. Rev. 193 (1940).

thereby afford the party calling him an opportunity to show why he called the witness. However, recourse to the right to impeach one's witness as to prior inconsistent statements is limited to the party calling the witness, or his attorney, who was misled and surprised or was entrapped as to a material fact or to his prejudice. *Smith v. Briscoe,* 65 Md. 561, 5 A. 334 (1886). See also *State Use of Welch v. B. & O. R. R. Co.,* 117 Md. 280, 83 A. 166 (1912), [exception not available but affirmed the *Smith* case]; *Murphy v. State,* 120 Md. 229, 87 A. 811 (1913), [extension of exception in *Smith* case to statement made by a witness to prosecuting witness refused]; *Travelers Ins. Co. v. Hermann,* 154 Md. 171, 140 A. 64 (1928), [evidence of witness must be prejudicial to party calling him, not merely not beneficial or disappointing]; *State Use of Chenoweth v. Balto. Contracting Co.,* 177 Md. 1, 6 A. 2d 625 (1939), [rule must be applied strictly, not simply by announcing that examination was to refresh memory of witness]; and *Meyerson v. State,* 181 Md. 105, 28 A. 2d 833 (1942), [rule applicable provided court was satisfied that party had been taken by surprise—answer of witness demonstrated State's Attorney was taken by surprise].

In recalling the witness, the State's Attorney did not apprise the court that he was surprised by the sworn testimony of the witness. In fact he did not even know the witness had made a prior inconsistent statement until he conferred with the trooper after the adjournment of court on the previous day. The State's Attorney merely informed the court that his intent and purpose in recalling the witness was to impeach him, and, with the permission of the court, after laying the usual foundation, that is what he did. Such action constituted prejudicial error. The authorities are divided as to whether a witness may be recalled for the purpose of laying a foundation to impeach him, but in view of our ruling that the impeachment was improper, we do not reach that question.

On the question of the propriety of permitting the trooper to testify to the *details of both statements,* despite the fact the recalled witness admitted he had made a prior inconsistent statement, the law writers and the decisions are not in accord. For instance, one law writer suggests it is proper to admit

such testimony.[2]   But another law writer states the prevailing view, and more expedient practice, is to the contrary.[3]   In *Barnard v. State,* 45 Tex. Cr. 67, 73 S. W. 957 (1903), it was held that, if the witness admits making the contradictory statement, such admission is conclusive, and further evidence thereof is not admissible.   See also 98 C. J. S., *Witnesses,* § 578k.   We are of the opinion that the testimony of the trooper under the circumstances in this case—where the contradictory statements were made by a material witness with respect to evidence which was material to the issue of the guilt or innocence of the defendant, and which, if his original testimony in court was believed, might have meant a verdict of not guilty instead of guilty—was prejudicial.

For the reasons stated, the judgment and sentence of the lower court must be reversed and a new trial ordered.   However, since the case must be retried, we shall review the instructions of the court with regard to malice and self-defense.

In a case such as this where the defendant is charged with a felonious homicide and pleaded self-defense, it was proper for the court to instruct the jury on both questions or points of law.   The court was correct when it instructed the jury that malice may be inferred from the use of a deadly weapon directly against a vital part of the body.   *Chisley v. State,* 202 Md. 87, 105, 95 A. 2d 577 (1953), and the cases therein cited; *Davis v. State,* 204 Md. 44, 51, 102 A. 2d 816 (1954). That it may be inferred, simply means it is evidence, among other facts, of a specific intent to take life.   See *Davis v. State, supra,* at p. 52.

As to the plea of self-defense, the court fairly covered the elements of that defense of which there was evidence to support the theory.   The court properly informed the jury that the right to defend one's self is based on necessity.   It then, in effect, instructed the jury that, in order to justify or excuse

---

2. 3 Wigmore, *Evidence* (3d ed. 1940), § 1037, and the cases cited in Note 4. See also *People v. Schainuck,* 286 N. Y. 161, 36 N. E. 2d 94 (1941).

3. McCormick, *Evidence* (1954), § 37, and the cases cited in Note 9.

the killing of another on the ground of self-defense, it was necessary to establish that the defendant was not the aggressor and did not provoke the conflict; that the defendant believed at the time he was in such immediate danger of losing his own life or suffering serious bodily harm as made it necessary to take the life of the deceased to save himself; that the circumstances were such as to warrant reasonable grounds for such belief in the mind of a man of ordinary reason; that, if the peril of the defendant was imminent, he did not have to retreat but had a right to stand his ground and to defend and protect himself; that an attempted battery may be met by resisting force with force provided no unnecessary violence was used and proper measures were taken to avoid the conflict and escape from shedding blood; and that it was the duty of the defendant to retreat or avoid danger if such means were within his power and consistent with his safety. An instruction that the defendant had a right to arm himself in anticipation of an assault was doubtless omitted by the court because there was no evidence to support the theory. As to the character of the deceased, there was evidence of the disparity in the size and weight of the parties, but there was no evidence of the dangerous character of the deceased other than that the defendant stated he was "scared" of him. Instructions on matters of which there was no evidence would be erroneous. *Jones v. State,* 182 Md. 653, 662, 35 A. 2d 916 (1944), and cases therein cited. The necessity for an instruction depends upon the facts in each particular case. 23 C. J. S., *Criminal Law,* § 1190. It is incumbent upon the court, however, when requested in a criminal case, to give an advisory instruction on every essential question or point of law supported by the evidence. See *Lester v. Commonwealth,* 239 Ky. 703, 40 S. W. 2d 306 (1931).

The defendant further complained that the quotation by the court from the *Chisley* case, *supra,* at p. 105, as it was read to the jury, was an improper statement of the law because it virtually ruled out the possibility of a verdict of "not guilty" despite the fact a plea of self-defense was interposed and proof of justification and excuse was introduced in evidence. The court advised the jury that, if it believed from the evidence

"that this killing *was done contrary to law* and without *legal justification and excuse,* then the problem becomes this to consider: Is it murder, or is it manslaughter?" The court then quoted from the opinion in the *Chisley* case in part as follows: "The law presumes all homicides to be committed with malice aforethought and to constitute murder. The burden is on the accused to show circumstances of alleviation, excuse, or justification, which will reduce the offense to manslaughter * * *." These are well settled principles of law.[4] The killing of one human being by another may be classified as either felonious or unlawful homicide *or* as justifiable and excusable homicide. As was pointed out in the *Chisley* case, at p. 104, felonious or unlawful homicide is divided into murder [a killing *with* malice aforethought] and manslaughter [a killing *without* malice aforethought]. And, even though the law does presume all homicides are committed with malice aforethought and are presumed to be murder, that does not mean a defendant may not introduce evidence of alleviation, excuse and justification in an effort to induce a verdict of manslaughter or of not guilty. Moreover, as the lower court properly advised the jury, the defendant is "presumed to be innocent until proven guilty beyond a reasonable doubt, and that presumption attends him throughout the trial until overcome by proof establishing his guilt beyond a reasonable doubt and to a moral certainty."

With regard to the quotation of the excerpt from the *Chisley* case, *supra,* we think that, if the court saw fit to cite the *Chisley* case, it should also have advised the jury that what was said in the *Chisley* case, with respect to the presumption all homicides are committed with malice aforethought and constitute murder, was further explained by the *Davis* case, *supra,* when we said at p. 51:

"*Chisley v. State,* 202 Md. 87, defined malice and it is apparent from that definition in the context in which it is found, that *in the absence of justification,*

---

4. See the casenote on *Chisley v. State, supra,* entitled *The Developing Law of Intentional Murder in Maryland,* 13 Md. L. Rev. 327, 335 (Welsh 1953).

*excuse or some circumstance of mitigation,* malice exists not only when there is an actual, express intent to kill, but may be inferred when there is an intent to do or inflict great bodily harm, or when one wilfully does an act or wilfully fails to do a duty and the natural tendency of the act or failure is to cause death or great bodily harm." (Emphasis added).

See also *Webb v. State,* 201 Md. 158, 93 A. 2d 80 (1952).

Concerning the time when objections should be made to the court's instructions, we observe a plain violation of Maryland Rule 739 f. The rule requires that the parties in criminal cases shall be afforded an opportunity to make seasonable objections to the instructions of the court and to state the reasons therefor *before,* not *after,* the jury retires to consider its verdict. The rule further provides that the parties have a right to make objections out of the presence of the jury, and in open court, upon application. It was proper for the court to disallow additional objections to be made three days after the jury had rendered its verdict.

> *Judgment and sentence reversed, and a new trial awarded; the county commissioners of Wicomico County to pay the costs.*