819 A.2d 1099

Norma BOONE, et. vir.

v.

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY.

No. 1772, Sept. Term, 2001.

Court of Special Appeals of Maryland.

March 26, 2003.

202

Peter Max Zimmerman (Harry Goldman, Jr., and Goldman & Skeen, P.A. on the brief), Baltimore, for appellants.

Judith C. Ensor (Whiteford, Taylor & Preston, L.L.P. on the brief), Towson, for appellee.

Argued before HOLLANDER, KRAUSER and THEODORE G. BLOOM (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

This appeal has its roots in a vehicular accident involving Earl and Norma Boone, appellants, and Donald Sites, the "at fault" driver. The case centers on the "underinsurance" provision of the Boones' automobile insurance policy.[1]

---

1. Both Mr. and Ms. Boone were plaintiffs below. On appeal, however, appellants' brief refers only to Ms. Boone as the appellant. Because the notice of appeal was filed by both Mr. *and* Ms. Boone, we shall refer to both parties as the appellants, although no specific complaint is asserted as to Mr. Boone's consortium claim.

Although the Boones obtained a monetary settlement from Sites's insurer for the maximum amount available under Sites's liability policy, they were of the view that their damages exceeded the amount of that settlement. Accordingly, they filed suit against their own insurer, American Manufacturers Mutual Insurance Company ("American" or the "Insurer"), appellee, to recover underinsured motorist benefits.[2] Following a two-day trial in the Circuit Court for Baltimore City, appellants counsel asked the jury to award the Boones damages of $150,000, while the Insurer's attorney requested an award of damages in the range of $12,000 to $25,000. The jury heeded American's request and awarded Ms. Boone $10,864.48 for medical expenses and $5,000 for past and future pain and suffering. No damages were awarded with respect to appellants' consortium claim.

Unhappy with the verdict, which appellants characterize as "shockingly low," the Boones unsuccessfully filed various post trial motions. Thereafter, they noted this appeal, in which they present the following six issues for our review:

I. Whether the Court erred in failing to give Plaintiffs proposed instruction that Plaintiff's prior recovery against the driver would be deducted from the jury's verdict and that the jury should therefore render a verdict for the full amount deemed fair and just, and not just an addition to whatever amount plaintiff had already recovered?

II. Whether the Court erred in failing to give Plaintiff's proposed pattern standard jury instructions on susceptibility to injury and aggravation of a pre-existing condition, where these issues were central to the trial, the examination of witnesses, and the final argument; and whether the Court was wrong to agree with Defendant's objection, based on an answer to interrogatory, where the pre-existing condition issue was explored in depositions, included in documen-

---

**2.** For reasons that are not clear in the record, appellants initially filed suit against Kemper Insurance Companies. American pointed out the error in its Answer. We also observe that, in the record, appellee is sometimes mistakenly referred to as American Manufacturing Mutual Insurance Company.

tary production, was the subject of documentary stipulations on authenticity, and fully explored at trial without objection, until the argument on instructions?

III. Whether the Court, in the same vein, wrongfully excluded the York Memorial Hospital records of the earlier accident in 1996?

IV. Whether the Court wrongfully excluded Plaintiff's offer of Dr. Shepherd's [sic] medical records as business records, where there was an agreement of authenticity, and where defense counsel had selectively questioned Dr. Shepherd [sic] about them?

V. Whether the Court wrongfully excluded the medical record of October 14, 1998, where questions asked by Defendants counsel on mobility on that visit opened up the subject and made it a fair subject of inquiry on redirect.

VI. Whether the court's illustration, by way of example in connection with its instruction on "mitigation" was prejudicially unfair?

For the reasons that follow, we shall vacate the judgment and remand the case for further proceedings.

## FACTUAL SUMMARY

On October 9, 1998, Norma Boone was a passenger in a pick up truck driven by her husband, Earl Boone. The Boones were traveling on York Road in northern Baltimore County when their vehicle was rear-ended by a vehicle operated by Donald Sites. The impact caused the Boones' truck to cross the center line and collide with an oncoming car. In addition, Ms. Boone was struck by a gun rack located behind her seat. Ms. Boone, who was 62 years of age at that time, was transported from the scene to York Memorial Hospital in York, Pennsylvania. She subsequently underwent a course of treatment for various injuries and eventually had shoulder surgery in June 2001.

As noted, Sites's liability insurer settled with appellants for the maximum amount available under his policy.[3] Through

---

3. We are told that Sites's insurer settled for $50,000.

the Insurer, the Boones had uninsured/underinsured coverage of $100,000. Accordingly, they made a claim under their own policy to recover additional damages. Dissatisfied with American's position, the Boones filed suit against the Insurer on October 16, 2000, claiming breach of contract and loss of consortium.

On or about January 5, 2001, American propounded a First Request for Production of Documents to appellants. According to appellee, appellants produced documents responsive to the discovery request in "drips and drabs," as late as August 7, 2001, which was just prior to the trial that began on August 14, 2001.

In January 2001, appellee also propounded interrogatories to appellants. Interrogatory No. 6, directed to both plaintiffs, was the subject of much controversy at trial. It asked:

If you contend that you suffered injuries and/or damages as a result of the occurrence alleged in the complaint, state with precision the nature of those injuries and/or damages and the nature of any present complaints, whether you contend the injuries are permanent, whether you had at any time either prior to or subsequent to the alleged incident ever injured those areas of your body (and, if so, under what circumstances) and whether you contend any previous injury or condition was aggravated by the occurrence alleged in the Complaint.

Approximately one month before trial, on or about July 12, 2001, appellants responded to the Interrogatories. In response to Interrogatory 6, appellants said:

1983 auto accident—knee and head, neck

1996 auto accident—left shoulder, soft tissue injury causing no bony abnormality

1998 auto accident—neck and left shoulder

Appellee's Interrogatory 11 was also at issue at trial. It asked appellants whether they contended "that a previous injury or condition was aggravated by the occurrence for which this suit had been brought." In answer to Interrogato-

ry 11, appellants expressly answered: "No such contention." Moreover, appellants never supplemented any of their answers to interrogatories.

During *voir dire*, the court introduced appellee by name and set out to explain the concept of underinsurance coverage, stating:

> I'll explain that there is a concept in coverage, insurance coverage—some of you may be familiar with it—called under insurance so that when a claim is made under certain circumstances it does permit this case to proceed in the form that it is. And that's what the defendant company is in this case for, what we call under insurance, but it's not something that should be of great interest to you except unless you've had some experience with what we call under insurance in the past. Has anyone had any such experience and, of course, has anyone had any contact for any reason with American Manufacturers Mutual Insurance Company? Ok. Now, I want to say at this point, I don't want to cause you to lose focus when I talk about insurance and all that business. Your focus is solely upon what happened on that day, October 9, 1998, whose fault was it if anyone's? Was there injury to the Boones? If so, what it was and what the compensation should be? And that's all you have to be concerned about and that's all I ask you to be concerned about in this case.

After the jury was selected, the trial court gave a preliminary outline to the jurors with respect to how the trial would proceed. The court said:

> [Y]ou're looking to see if there was reasonable conduct in the operation of a motor vehicle [by Mr. Sites].... Was there fault, was there injury occasioned by that fault and what are the damages, if any, that you award for that fault or negligence as we sometimes call it.

In his opening argument, appellants' attorney said, without objection:

> Mr. Sites' insurance which was paid is insufficient in our view to fully compensating [sic] her for this injury and she

has a paid American Mutual Manufacturers Liability insurance policy with an under insurance clause so she has the right to bring a suit which, technically, is a breach of contract. We say that American Mutual Liability isn't paying what it should because we've got damages more than Mr. Sites' policy.

In her opening statement, appellee's counsel expressly conceded that there was "absolutely no question that Donald Sites was at fault for that accident." Therefore, she admonished the jurors not to "concern yourselves" with the issue of fault. Defense counsel also acknowledged that the accident was "pretty bad," and conceded that Ms. Boone injured her left shoulder. But, appellee's attorney explained that the disagreement was with regard to the amount of compensation:

They are absolutely entitled to insurance coverage. They have purchased what's called under insured motorist protection. That means, if they are in an accident where it is not their fault, where they are hit by someone else and they are not properly compensated, they are not sufficiently compensated, they have a right as [appellant's counsel] told you, they have a right to bring a law suit and seek money damages from their own insurance carrier, even though the accident was not my client's fault, certainly, even though my client has absolutely no affiliation with Mr. Sites at all. I've never even met the man. Doesn't matter. If they were not fairly compensated, they have a right to come to my company, my client, and ask for additional compensation. That's what underinsured motorist protection is all about. Now, you don't need to concern yourselves with how much money they've already received. That's irrelevant for your purposes. What you have to do today and perhaps tomorrow, you have to decide the case before you fairly, impartially. You have to decide what you think Ms. Boone's and perhaps Mr. Boone's, because I know they're making a claim for loss of consortium, what would fairly compensate them. Whatever that number is, my client is prepared to live with.

At trial, the parties hotly disputed the extent of injuries that Ms. Boone suffered as a result of the accident in issue. The

court restricted appellants to the precise information contained in their answers to interrogatories.

Appellants called Dr. Douglas Shepard, an orthopedic surgeon, as their first witness and their only expert. A graduate of Johns Hopkins University and Baylor College of Medicine, Dr. Shepard is a Board-certified orthopedic surgeon. He began to treat Ms. Boone for her injuries on November 20, 1998, upon referral by Dr. Eric Fisher, an internist. Dr. Fisher, who initially treated Ms. Boone after the accident, practiced in the same office as Dr. Shepard.

Dr. Shepard recounted Ms. Boone's history and course of treatment, noting that she was first seen by Dr. Fisher on October 14, 1998. Dr. Shepard explained from the medical notes that Dr. Fisher requested an orthopedic consult because "some of her pain, like in her lower back, got better but her shoulder [pain] persisted. . . ."

According to Dr. Shepard, Ms. Boone's "chief complaint" when he first saw her was pain in the side of her neck, radiating to the left "shoulder blade in the back and pain in these muscles . . . between your shoulder blade and neck and that pain radiated down to . . . the mid-part of the arm, and she had occasional numbness and tingling in the fingers." Initially, he arrived at three "impressions": "whip lash"; an inflammation of the trapezium muscle; and "subacromial impingement syndrome" or "pinching" of the "muscles that go from her shoulder blade to . . . the rotator cuff. . . ." Further diagnostic testing showed an inflamation and "partial fraying or tear" of the rotator cuff (i.e., muscle and tendon), and a torn glenoid labrum (cartilage).

Because Ms. Boone's shoulder problem did not resolve, Dr. Shepard performed arthroscopic shoulder surgery, or "shoulder shaving," on Ms. Boone on June 25, 2001. The doctor opined that Ms. Boone was still impaired, post-operatively. Further, he opined that, as a result of the accident of October 9, 1998, Ms. Boone suffered a 25% permanent disability to her "normal neck function," and a 30–35% permanent disability of the shoulder. The doctor testified on direct, in part:

[APPELLANTS' COUNSEL]: Doctor, do you have an opinion within a reasonable degree of medical probability as to whether the conditions for which you operated on Ms. Boone in June of 2001 were causally related to the accident of October 9, 1998?

[DR. SHEPARD]: Yes I do.

[APPELLANTS' COUNSEL]: And what is your opinion please?

[DR. SHEPARD]: My opinion is that her shoulder injury was related to the car accident—I mean, the motor vehicle accident and her neck problem was made worse by the car accident.

[APPELLANTS' COUNSEL]: When you say made worse, what was it in the neck that was worse as a result of the injury she received in the motor vehicle accident?

[DR. SHEPARD]: Well, she had some arthritis demonstrated on her X-rays and she didn't have perfect neck function. It was only functional but the accident made her stiffness and loss of motion, pain and spasm in this area significantly worse and more constant.

[APPELLANTS' COUNSEL]: Do you have an opinion, in other words, did that arthritis flared [sic] up and became aggravated as a result of the injury?

[DR. SHEPARD]: That's my opinion.

According to Dr. Shepard, on November 12, 1999, appellant completed a form for a medical visit with him, in which she was asked if she had ever had a prior injury to her body. The doctor testified that appellant wrote that in "April, 1996 she jammed her left shoulder by catching a dash board with hands when we were hit at a stop light."

At the conclusion of Dr. Shepard's direct testimony, appellants' counsel offered into evidence Dr. Shepard's medical records, reports, and notes pertaining to Ms. Boone, asserting that defense counsel had stipulated to their authenticity. The following colloquy ensued:

[APPELLANTS' COUNSEL]: Just very quickly, Plaintiffs 6 are all the bills, 5A is the York Hospital, 5B is the complete chart including Dr. Shepard's notes, 5C is the physical therapy chart and 5D is the MRI and 5E is a follow up report.

\* \* \*

[APPELLEE'S COUNSEL]: Your Honor, I said I would stipulate to the bills. I didn't say I was going to let all this stuff come in. . . . I stipulated that it was genuine and that it was authentic and I specifically said in my letter that I reserve all rights with respect to admissibility.

\* \* \*

[THE COURT]: The point is, you cannot use substantive medical reports and put them into evidence. You know that, because he's testified to it. . . .

[APPELLANTS' COUNSEL]: Well, his whole office char[t] is a record made and kept in the regular course of his profession. It's admissible under the business records statute.

Further, appellants' attorney indicated that he had "cut" the doctors examination "short," which he would not have done if he had known that he would not be allowed to introduce the various medical records and reports. The trial judge inquired: "What have you not asked him about?" Appellants' lawyer responded: "Well . . . I didn't get all the complaints. . . ." The trial judge said that he would allow appellants' counsel to reopen the examination of Dr. Shepard in order to elicit additional testimony that appellants felt was necessary.

After a lengthy exchange with the court about the admissibility of certain medical records, appellants' counsel said that "there's another doctor in the office by the name of Fisher. I would like Fisher's notes in." The court refused to admit Dr. Fisher's notes, saying: "It's going from bad to worse." The

court quipped: How about a doctor in Canada that we haven't heard of? Why don't we get those in too? [4]

Shortly thereafter, the forelady of the jury posed a question to the court. The following colloquy is noteworthy:

[FORELADY]: We were wondering how long the couple had been insured with this insurance company for the under insurance policy.

[THE COURT]: Well, we don't know the answer and I don't think we are going to know it in this case because it really is not an issue.

[FORELADY]: Ok.

[THE COURT]: I have to add. Were going to focus just on whether or not there's been injury to the person and caused by the negligence of someone else and if so, what damages if any? They're the only the [sic] question and I thank you very much for your good intentions.

---

4. We note that the Record does not include any original·trial exhibits. The Record Extract contains several of Dr. Fisher's notes, however. We mention the content of some of them because the court's refusal to admit certain of these records is an issue on appeal. Moreover, appellee complained below that appellants had not disclosed any injury to Ms. Boone's back.

The medical notes show that appellant was first seen by Dr. Fisher on October 14, 1998, complaining of pain to the neck, shoulder, chest, calf, and *"back along the lower rib margins."* It also described tightness and tenderness of the thoracolumbar paravertebrae muscles. The medical impression was as follows:

*IMPRESSION:* It is our assessment then that Ms. Boone has sustained musculoligamentous strain injuries to the supporting structures of the entire vertebral column as well as to the left shoulder girdle. She has contusion to the lower ribs anteriorly and.posteriorly as well as to the mid sternal region in no small measure because of the restriction to her chest and abdomen by the seat belt. She has a contusion strain to the distal right calf.

In a note of October 26, 1998, Dr. Fisher wrote that Ms. Boone "complains of ... quite a bit of stiffness in the neck, in the left shoulder, and *in the lower back.*" Another "Follow-up note" refers to a visit on November 11, 1998. There, Dr. Fisher points out, under the heading of *"Back,"* the following: "Examination reveals palpable tightness and tenderness of the left trapezius area."
(Emphasis added).

On cross-examination, the doctor was questioned about Ms. Boone's prior injuries to her neck and shoulder. Dr. Shepard opined that the injury to Ms. Boone's rotator cuff was "clearly a result of the 1998 accident." Although the doctor could not rule out a tear to the glenoid labrum in 1996, when Ms. Boone was involved in another accident, he noted that Ms. Boone had not sought "medical attention" for it and it was "not symptomatic ... for two years." Therefore, he reasoned that any earlier problem was "either ... [a] minimal problem or not symptomatic." The doctor explained:

[T]he 1998 accident made it painful enough that then she sought medical attention. A lot of people have arthritis in their neck and back. They will take an Advil and they do fine. They then get an injury and whatever was there pre-existent flares. Then they seek medical attention.

Although Dr. Shepard acknowledged that he had no idea whether Ms. Boone had sought any medical attention after the 1996 car accident, he maintained that the 1996 accident was "irrelevant" to "this patient's injury in this case." He said: "The findings at surgery are all relevant to this accident ... not the fact she hit a dash board two years ago to brace herself in a[n] accident."

Defense counsel also discussed Ms. Boone's pre-existing condition by reference to portions of Dr. Shepard's records. For example, defense counsel asked about a letter of September 8, 1999, from Neil Novin, M.D. to Dr. Shepard, which mentioned a prior accident in which plaintiff's neck was injured, and sought an opinion as to whether there were "objective changes" due to an accident in 1998. Dr. Shepard agreed that, in his ratings of Ms. Boone's disabilities, he did not "take into account at all any prior injuries" to Ms. Boone's neck or shoulder. The following colloquy is relevant:

[APPELLEE'S COUNSEL]: You specifically asked Ms. Boone if she had any prior injuries, didn't you Dr. Shepard?
[DR. SHEPARD]: Yes.
[APPELLEE'S COUNSEL]: And you asked her that when you saw her on November 20, 1998, right?

[DR. SHEPARD]: Yes.

[APPELLEE'S COUNSEL]: And you specifically asked her about injuries to her neck or to her shoulder?

[DR. SHEPARD]: Yes.

[APPELLEE'S COUNSEL]: And she told you that she hadn't had any, didn't [she] Doctor?

[DR. SHEPARD]: Yes.

[APPELLEE'S COUNSEL]: Now since then you found out that that's not true?

[DR. SHEPARD]: Yes.

[APPELLEE'S COUNSEL]: She has had prior injuries hasn't she Doctor?

[DR. SHEPARD]: Yes.

[APPELLEE'S COUNSEL]: And she has, in fact, had prior injuries to her neck and to her left shoulder. Isn't that right?

[DR. SHEPARD]: Yes.

[APPELLEE'S COUNSEL]: And, in fact, those are the same areas of her body about which she makes complaint in this law suit?

[DR. SHEPARD]: Yes.

During the re-direct examination of Dr. Shepard, appellants unsuccessfully attempted to introduce into evidence Ms. Boone's medical records from York Memorial Hospital relating to treatment she received in connection with the 1996 accident. The court responded: "You want to try that case, too." Appellants' counsel explained: "[T]he point is, [defense counsel] . . . is trying to lay some of the blame for [the current injuries] on the 1996 injury. . . ." Appellants' counsel argued that the 1996 hospital record showed only a "slight" injury and a "superficial examination."

In her testimony, Ms. Boone attempted to discuss a hand injury that she allegedly suffered in the accident. The court sustained appellee's objection, stating:

[Appellants' counsel] submitted for the first time in this case a hand injury as opposed to shoulder and arm and I have a

rule that it is too late. It was not referenced in the interrogatory answers. No. 6 (indiscernible), and therefore, it is simply too late as being the day of trial.

Appellants' attorney later asked the court to "revisit" it's decision as to the hand injury, claiming the matter had been disclosed at Ms. Boone's deposition on August 2, 2001. The court said:

> Well, the issue is whether or not you were telling the Defense in discovery that you are claiming something that triggers the defense. If you say you're claiming a hand deficit it causes the defense to become defensive, so to speak, and to perhaps look to that in greater depth in deposition. To look for medical substantiation. To contact an expert, perhaps, to question the medical experts about it, and all those things are tripped into action by the interrogatory answer which is very important in my view, because they are what you intend. So, putting it in reverse, silence on an issue; what you are claiming, right ear, left ear, left eye and no mention of the right eye. And then here you say, oh, also the right eye. I think it's fair for a reasonable defense attorney to assume your silence means you are not claiming something. You said nothing about the right knee caps either, right?

Ms. Boone also attempted to testify about a back injury she sustained in the accident involving Mr. Sites. During her direct examination, in response to an inquiry regarding physical therapy, Ms. Boone stated:

> The first visit was an examination and just sort of a rub down and stretching. When he had pulled on my head and neck in that it took the weight off of my back. It just felt like my head was too heavy for the rest of me. When he pulled on me it eased the pain in my back and my neck so he decided on the second visit, besides the moist heat that they use, the heating pads, they would add traction to it to help straighten out the pain in my back because I was bruised and my entire back was swelled from where I had hit the seat.

Defense counsel immediately asked to approach the bench. In response to the court's inquiry as to the "problem," defense counsel said: "Your Honor, answer to interrogatory no. 6 is my problem. The woman claimed injury to her neck and her shoulder." The court then took a recess.

The next day, during direct examination of Ms. Boone, her lawyer showed her a heating pad and asked if it was "the heating pad that [she] used." Ms. Boone responded that it was the heating pad "for the back," adding that she had another heating pad for her neck. At that point, defense counsel asserted: "Your honor, the only damage that's being claimed in this case are to the neck and shoulder." Appellant's attorney objected to defense counsel's assertion in the jury's presence, which was sustained. Nevertheless, the following discussion ensued in the jury's presence:

[COURT]: ... I think it's fair to tell the jury that the damages claimed here are limited to the neck and the shoulder and somewhat in the back.

[APPELLANTS' COUNSEL]: Well, there were injuries to the back recorded at York Hospital about that.

[COURT]: The same problem. It's neck and shoulder according to the interrogatory, correct?

[APPELLEE'S COUNSEL]: Yes, sir.

[APPELLANTS' COUNSEL]: That's always the—

[COURT]: When I spoke about the back, I only refer to where the shoulder forms a part of the back. That's all I met [sic]. But it's shoulder and neck ladies and gentlemen, and that's because that's the standard of this trial. And there is no other injury to be considered.

On direct examination, Ms. Boone denied any use of a neck pad in regard to a prior accident that occurred in April 1996. She also claimed "there were no treatments" with respect to the 1996 accident.

The following colloquy from cross-examination is also relevant:

[APPELLEE'S COUNSEL]: And your biggest complaint when you saw Dr. Fisher was a pain in your left shoulder, right?

[MS. BOONE]: I think it was more than that. I wasn't walking upright at the time. I couldn't straighten up.

[APPELLEE'S COUNSEL]: Well, if Dr. Fishers note says you were walking fine, would you have a quarrel with that?

[MS. BOONE]: Yes, I think I would.

During the redirect examination of Ms. Boone, appellee's counsel again objected to appellants' attempt to show that Ms. Boone sustained an injury to her back as a result of the accident in issue, because it had not been disclosed in Ms. Boone's answers to interrogatories. The following colloquy is relevant:

[APPELLEE'S COUNSEL]: Your Honor, may I please object? The injuries in this case, the injuries claimed are to the neck and the shoulder. [Appellants' counsel] repeated [sic] brings up other injuries, other accidents, and it's just not fair [Y]our Honor.

[THE COURT]: Yeah, there are no other injuries that's [sic] before this jury.

Appellants' attorney insisted that "the first question that [defense] Counsel asked had to do with the mobility of [appellant's] back and the fact that she could walk well according to Dr. Fisher's note." Appellants' counsel then referred to "Dr. Fisher's note" of October 14, 1998, which he claimed was contrary to defense counsel's representation. Appellee's counsel objected to the admission of the note, and the following discussion transpired at the bench:

[THE COURT]: The question is what is this piece of paper?

[APPELLANTS' COUNSEL]: This is the record of Dr. Fisher to which Counsel referred on cross-examination [of Ms. Boone] on the first consultation. And [the defense attorney] said; you were moving your back well, you were walking well or something like that. And it's completely contrary.

[THE COURT]: So he did refer to it.

[APPELLEE'S COUNSEL]: Your Honor, he's not suppose [sic] to be talking about any injuries to the back. . . . There is no injury to the back. She can not make any complaints about injury to the back from this accident.

[THE COURT]: Is this all about the back?

[APPELLANTS' COUNSEL]: Exactly. It's all about the back, and her question was about the back.

[THE COURT]: Well its too bad she didn't tell us about the back injury. Maybe the next case.

Appellants also introduced testimony of Officer Donovan, who investigated the 1998 accident. Prior to closing, plaintiffs counsel again sought to introduce the "actual hospital records" of Ms. Boone from "the various health care facilities." The judge excluded them, on the basis that "the jury has heard testimony live from a doctor and from Ms. Boone as to her treatment. . . ." Appellee did not present any witnesses.

At the end of trial, appellants requested the following jury instructions, among others:

## MPJI 10:3
### SUSCEPTIBILITY TO INJURY

The effect that an injury might have upon a particular person depends upon the susceptibility to injury of the plaintiff. In other words, the fact that the injury would have been less serious if inflicted upon another person should not affect the amount of damages to which the plaintiff may be entitled.

## MPJI 10:4
### AGGRAVATION OF PREVIOUS CONDITION

A person who had a particular condition before the accident may be awarded damages for the aggravation or worsening of that condition.

The following discussion ensued:

[COURT]: What's the susceptibility to injury? Your [instructions] 9 and 10, aggravation?

[APPELLANTS' COUNSEL]: Well, it's obvious that she had trouble to her neck which she admits . . .

[COURT]: You don't have any medical [evidence] here to support that.

[APPELLANTS' COUNSEL]: That's exactly what Dr. Shepard said from the stand.

[COURT]: Right. That it was—he did say that as to the neck, did he not?

At that point, defense counsel asserted that although the doctor had so stated, appellants did not claim any aggravation in their answers to appellee's interrogatories. Counsel for appellants then responded that appellee's lawyer "should have objected. It's too late." Later, appellants' lawyer reiterated that "the evidence [of aggravation] went in without objection." Appellants' attorney added: "Well, then you should have objected. It's too late. We've been beaten about the head with that interrogatory [answer] and that interrogatory referred only to permanent injury . . . ." Nevertheless, the judge agreed with the defense and declined to give the instructions requested by appellants concerning aggravation of a pre-existing condition.

The Boones also requested that the court give their proposed jury instruction 7B, concerning underinsurance. The instruction stated:

Members of the jury in finding a verdict for Mrs. Boone in this case, you are instructed that the amount which Mrs. Boone received from the underinsured driver, Mr. Sites, will be subtracted from the total amount of money which you award Mrs. Bone. In other words, there will be no double recovery by Mrs. Boone.

Appellants' counsel argued strenuously that the proposed underinsurance instruction was needed to avoid a misperception by the jury that appellants would obtain a "double recovery" or otherwise benefit from double-dipping. Citing *Farley v. Allstate Insurance Co.*, 355 Md. 34, 733 A.2d 1014 (1999),

appellants claimed the case did not bar the court "from straightening the jury out." In urging the court to instruct the jury about underinsurance, appellants' counsel said:

Judge, I can practically tell you right now that there are going to be people on that jury who think that my client is double dipping and she's getting a double recovery and there's nothing in *Farley* that forbids you from straightening the jury out. What is the fact and the truth ought to be put before this jury because otherwise this verdict is going to be cut and they're going to guess that we've recovered a certain amount and when I ask the jury for X dollars, they're going to cut it in half, all kinds of distortion. Everything that Judge Chasnow complained about [in *Farley v. Allstate* ]. Judge Chasnow only said, you can't talk about the amount they got in settlement and you can't talk about the limits that the Defendant has or that the carrier has, but that doesn't mean that you can't barr [sic] the jury from speculating about double dipping and double recovery and the fact that we're trying to get money from Sites and then stack what we get from this company.

The trial judge responded:

No one's disputing its a risk. It's the nature of the case ... [W]hat always troubled me about these cases is to say nothing about what this is all about. What this is all about is underinsurance. They know that but they don't know what it means.

Appellee's attorney argued that the jury merely had to "determine what the value is of the case and they do understand that. What is the value of the case? ... Beyond that, sort of, the law takes over." She added: "There's no reason for this jury to know anything more than that." ·

Appellants' counsel countered:

Uninformed juries always lead—uninformed juries lead to unjust verdicts because obviously they're going to wonder why she's getting more? Why—whether the amount that Plaintiff's [sic] counsel is asking for is on top of what she got from cites [sic] and she's getting double recovery. I feel

very strongly and don't think there [sic]—I think that the logic is unsalable [sic] and I don't know why the Court of Special Appeals and Court of Appeals didn't straighten it out. But it happens in every underinsured and it's a gift, it's a gift of thousands of dollars to the underinsured carrier because of the prejudice that's going to result.

Ultimately, the judge refused to give appellants' proposed instruction 7B. Instead, in its closing instructions to the jury, the trial court said, in part:

I do want to say, there's been some kind of obscure references to the—*what we call underinsurance and basically, to repeat, it simply means that when you recover for someone's fault that harms you, you recover against the person who harmed you. But suppose, for example, you don't believe it's enough?* It's not a fair compensation. *You have a right under certain circumstances to go against or to claim against your own policy* which may carry what we call under insurance so that in a sense you *make up a deficit* in the eyes of the Plaintiffs, *a deficit.* However—and, of course, you would be curious to know what the amount, if any, there was before this trial commenced and the answer that I've given you before is that that is absolutely not involved in this case and you should not speculate about that. I'm not even hinting that there has been anything like that. I'm only trying to explain what this concept of under insurance means but for your purposes, knowing that explanation, I ask you ... to confine yourselves only to the decision you have to make in this case. And that is simply this, Ms. Boone was harmed by the negligence of Mr. Sites. She's entitled to fair compensation based upon the evidence that she has submitted to you in this courtroom in this trial. What do you think is fair compensation, given the accident, given what she's testified to? What she may or may not be looking elsewhere for, has absolutely nothing to do with this case. Nothing. Keep your blinders on and look only at that one question, phrased here as two questions. What are the damages, if any? And

I break them out into two. Past medical expenses. B. non-economic.

(Emphasis added).

After the court instructed the jury, the following occurred:

[APPELLANTS' COUNSEL]: ... I except to the failure of the Court to give instruction 7A. From what I understand I'm being allowed to argue that. That's the one about failure to call an expert witness. 7B, I have argued strenuously that it distorts the verdict in favor of the Defendant (inaudible).

\* \* \*

No. 9, I think that susceptibility to injuries here in this case, if for no other reason than the fact she had been in a previous accident and the fact that she had arthritis. I think, in effect, the-and that's right out of PJI. The fact that an injury might have been-the effect that an injury might have upon a particular person....

\* \* \*

[COURT]: It would have been most helpful had you put it in the case.

\* \* \*

[APPELLANTS' COUNSEL]: [Defense counsel] put it in the case.... My client came to the doctor saying that she had previous neck trouble. That's all it takes. Same for aggravation of a previous condition, no. 10 ...

Although the judge said he would give an instruction on the collateral source rule, he failed to do so. When appellants' lawyer pointed out the omission during exceptions, the court reiterated that it would instruct on the collateral source rule. Nevertheless, it did not do so.

In closing argument, appellants' counsel told the jury: "The issue of the importance of the 1996 accident was a significant issue, perhaps the most significant issue. Defense counsel

referred again and again to the 1996 accident or other accidents in order to minimize the damages due to the 1998 accident at issue here." Appellants' attorney asked the jury to award damages of $150,000.

The defense attorney argued:

Please keep in mind that this is a contract case. It's about an agreement that the Boones made with my client. That's what it's about. It's not about other accidents in which they were involved. It's not about Mr. Boone's back injury 20 years ago. It's not about any of that. It's about an agreement. And the agreement is, that *if the Boones were injured by someone and not sufficiently compensated by that person's insurance my client would step in.* That's the deal we struck and my client is fully prepared to honor that agreement in the event that you find—you know, whatever number it is that you attribute to the injuries claimed by the Plaintiffs. *If they haven't been compensated already, my folks stand ready to pay.*

\* \* \*

Was the labrum tear which was repaired in the surgery related to the accident in 1996 or was it related to the accident in 1998. If there's a question in your mind, you cant give damages for that. [Appellants' attorney] had to prove that to you.

Further, the defense attorney told the jury that American was "never quibbling about the accident." Indeed, she conceded that "[i]t was always a significant accident," adding: "I would expect you to compensate her for having been in the car accident." But, defense counsel maintained that "[t]he question is, what damages did this lady and her husband sustain, if any?" Appellee's counsel suggested to the jury that it award damages in the range of $12,000 to $25,000.

As we noted, the jury returned a verdict of $10,864.48 for medical expenses and $5,000 for past and future pain and

suffering. After the court denied appellants' post-trial motions, this appeal followed.

We shall include additional facts in our discussion.

## DISCUSSION

Appellants contend that the circuit erred in refusing "to instruct the jury on the mechanism of underinsurance," in a manner consistent with appellants proposed jury instruction 7B.[5] Appellants insist that, "[h]aving made the presence of underinsurance well known, the Court was obliged to tell the jury the law applicable to underinsurance." Moreover, they point out that the Insurer "never challenged the correctness of the plaintiffs proposed instruction...." In their view, the Insurer's

excuse that the jury doesn't need to know, and that the law would sort it out later, is simply unacceptable. The trial judge should never have left the jury in a fog as to how the insurance worked. This is not a situation where the instructions otherwise fairly covered the matter.

Further, appellants maintain that,·

despite this complicated scenario of underinsurance—understood only by lawyers who do this kind of work, and certainly not by jurors—there was repeated mention and comment on underinsurance without any explanation of how it worked....

Thus, appellants theorize that they suffered a reduced verdict because of the court's failure to explain to the jury that any award of damages would be reduced by the amount that appellants already recovered from Sites, so as to clarify that appellants would not enjoy a windfall or a "double recovery."

___

5. For convenience, we again set forth the text of appellants' Proposed Instruction 7B.

Members of the jury in finding a verdict for Mrs. Boone in this case, you are instructed that the amount which Mrs. Boone received from the underinsured driver, Mr. Sites, will be subtracted from the total amount of money which you award Mrs. Boone.

In other words, there will be no double recovery by Mrs. Boone.

As a result of the court's failure to so advise the jury, appellants maintain that the jury undoubtedly believed that the damages it awarded merely constituted "a supplement" or "add-on" to "an unknown sum already recovered [from Sites], rather than a full verdict for the entire amount of damages." In appellants' view, "[t]he extremely low verdict—out of all proportion to the uncontradicted expert evidence of Dr. Sheph[a]rd," and less than the $12,000 to $25,000 "range" urged by American's attorney, "re-enforces the conclusion that the jury was confused."

In urging that we uphold the trial judge, appellee counters that "[t]he jury is not to be burdened with extraneous information regarding limits and mathematical calculations." In it's view, "[t]he jury is simply to be told that it is to determine the compensation, if any, to which a Plaintiff is entitled."

In the context of this matter, in which the court twice said that the case involved a claim for underinsurance coverage as a result of an alleged "deficit" in appellants' recovery from Sites, the tortfeasor, we agree with appellants that the jury may have been confused as to whether it was to award compensation as a supplement to the recovery from Sites, or, instead, to award damages as if no recovery had ever been obtained by the Boones from Sites.

We begin our analysis with reference to Maryland Rule 2–520(c). It provides, in pertinent part:

(c) *How Given.* The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

It is beyond cavil that a trial court must properly instruct the jury on a point of law that is supported by some evidence in the record. *See Myers v. Alessi,* 80 Md.App. 124, 132, 560 A.2d 59 [1989] ("It is firmly established that under Md. Rule 2–520(c) a trial judge is not obligated to give a requested instruction if the matter is fairly covered in the instructions already given."), *cert. denied,* 317 Md. 640, 566

A.2d 101 (1989); see also Gunning v. State, 347 Md. 332, 347–48, 701 A.2d 374 (1997) (interpreting analogous criminal rule, Rule 4–325(c)); *Dykes v. State,* 319 Md. 206, 220, 571 A.2d 1251 (1990) (applying Md. Rule 4–325(c)); *Wiegmann v. State,* 118 Md.App. 317, 349, 702 A.2d 928 (1997), ("Maryland Rule 4–325(c) provides that if a party requests an instruction that correctly states the applicable law generated by the evidence, which has not been covered in the instructions already given, the trial court is required to give the instruction."), *aff'd,* 350 Md. 585, 714 A.2d 841 (1998). Indeed, when requested, " 'it is incumbent upon the court ... to give an instruction on every essential question or point of law supported by the evidence.' " *Robertson v. State,* 112 Md.App. 366, 374, 685 A.2d 805 (1996) (quoting *Bruce v. State,* 218 Md. 87, 97, 145 A.2d 428 (1958)); *see Smith v. State,* 302 Md. 175, 179, 486 A.2d 196 (1985). This is because a party is "generally entitled to present his theory of the case through a requested instruction when there is evidence before the jury that supports it." *Robertson,* 112 Md.App. at 375, 685 A.2d 805; *see Johnson v. State,* 303 Md. 487, 512, 495 A.2d 1 (1985), ("The test for whether an instruction was proper has two aspects: (1) whether the instruction correctly states the law, and (2) whether the law is applicable in light of the evidence before the jury."), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986).

In *Robertson,* 112 Md.App. at 385, 685 A.2d 805, a criminal case, we explained:

> The main purpose of a jury instruction is to aid the jury in clearly understanding the case and considering the testimony; to provide guidance for the jury's deliberations by directing their attention to the legal principles that apply to and govern the facts in the case; and to ensure that the jury is informed of the law so that it can arrive at a fair and just verdict. Accurate jury instructions are also essential for safeguarding a defendant's right to a fair trial. The court's instructions should fairly and adequately protect an accused's rights by covering the controlling issues of the case.

Conversely, a trial court is not required to give a particular instruction unless it constitutes an accurate statement of the law *and* is applicable to the facts and circumstances of the case. *See Wegad v. Howard Street Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123 (1992) (noting that any requested instruction must meet two conditions: "(1) the [requested] condition must correctly state the law, and (2) that law must be applicable in light of the evidence before the jury."); *see also Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984); *Ellison v. State,* 104 Md.App. 655, 657 A.2d 402, *cert. denied,* 340 Md. 216, 665 A.2d 1058 (1995). Nor is a trial court required to give an instruction that is redundant. As the Court of Appeals explained in *Farley v. Allstate Ins. Co.,* 355 Md. 34, 46–47, 733 A.2d 1014 (1999):

[T]he standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them.

\* \* \*

Thus, simply because a requested instruction is an accurate statement of the law and supported by the evidence does not mean the trial judge is required to give it to the jury. So long as the trial judge has covered the applicable law in another instruction, or combination of instructions, Md. Rule 2–520(c) makes clear that he or she does not have to give it to the jurors.

Recently, this Court elaborated on the standard of review as to jury instructions. In *University of Maryland Medical System v. Malory,* 143 Md.App. 327, 337, 795 A.2d 107 (2001), *cert. denied,* 368 Md. 527, 796 A.2d 696 (2002), we said:

In order to determine whether the instructions, as provided by the trial court, rise to the level of commanding a reversal of the jury verdict, we must look to the underlying objective of jury instructions. We have previously stated that

[t]he purpose of jury instructions is to aid the jury in clearly understanding the case and ... to provide guid-

ance for the jury's deliberations by directing its attention to the legal principles that apply to and govern the facts in the case; and to ensure that the jury is informed of the law so that it can arrive at a fair and just verdict. *See also Molock v. Dorchester County Family YMCA, Inc.*, 139 Md.App. 664, 672, 779 A.2d 963 (2001).

Both sides rely on *Farley v. Allstate Insurance Co.*, 355 Md. 34, 733 A.2d 1014, *supra*, to support their respective positions. In *Farley*, the appellants brought a breach of contract action against Allstate, their own insurance company, for nonpayment of underinsured motorist benefits. Mr. Farley, who was injured in an automobile accident, had settled with the tortfeasor's insurer for the policy limits of $25,000. Based on the underinsurance protection afforded by their own insurance company, the Farleys then sued their own insurer to recover additional damages. At trial, the court specifically instructed the lawyers "not to inform the jurors that the case involved underinsured motorist coverage." *Id.* at 42, 733 A.2d 1014. Moreover, the court directed counsel not to disclose the terms of the insurance policy, including the policy limits, or the amount of the settlement. Thereafter, the jury only awarded the Farleys damages of $31,087.02.

On appeal, the Farleys complained about the trial court's refusal to allow them to introduce in evidence the actual insurance policy, including the amount of coverage. They argued that they were prejudiced, because the jury did not know the " 'whole picture' " and had "to decide the case in a 'vacuum'...." *Id.* at 42, 733 A.2d 1014. The Court of Appeals rejected that contention.

The *Farley* Court acknowledged that when an "insurance carrier is a party to the litigation, obviously the existence of insurance cannot be kept from the jury." *Id.* at 42, 733 A.2d 1014. The Court was clear, however, that "[i]n such cases ... the *amount* of uninsured/underinsured motorist *coverage* should not be disclosed unless the amount itself is in controversy." *Id.* at 42, 733 A.2d 1014 (emphasis added). As the Court explained, "the amount of an insured's coverage is not

relevant to the jury's consideration of damages." *Id.* at 43, 733 A.2d 1014. It reasoned that "if the jury were provided with a definitive amount of available policy limits the likely result would be a distorted jury verdict." *Id.* Thus, the Court said that "the amount of policy limits is in no way probative of the issue of damages, absent a controversy in the amount of coverage itself." *Id.* at 45, 733 A.2d 1014. Because the policy was "irrelevant" to the issue of the Farleys' damages, no error occurred. *Id.* at 45, 733 A.2d 1014.

In reaching its result, the Court pointed out that the case was not "a contract action in the sense that any provisions of the insurance policy were at issue...." *Id.* Rather, the compensation sought by the *Farleys* was "for tort-not contract-damages." *Id.* Therefore, the jury's "sole responsibility was to ... determine what amount, if any, Allstate should be obligated to pay...." *Id.* at 46, 733 A.2d 1014. The Court also noted that the verdict sheet "reflect[ed] the tort-not contract-flavor of the case when it direct[ed] the jurors to decide" such matters as "noneconomic damages." *Id.* Accordingly, the Court was satisfied that, despite the label of a contract claim, the trial court "properly instructed the jury to consider the issue of damages in a tort case." *Id.*

The *Farley* Court also reaffirmed its holding in *Allstate Insurance Co. v. Miller*, 315 Md. 182, 553 A.2d 1268 (1989). *Farley,* 355 Md. at 43, 733 A.2d 1014. We turn to consider that case.

Ms. Miller was injured in a motor vehicle accident and sued her employer's insurer under the uninsured motorist provision of her employer's policy. Significantly, the trial court "directed the jury to only consider the issue of the plaintiff's damages," based on "the elements of damage that typically are involved in a tort case." *Miller,* 315 Md. at 184, 553 A.2d 1268. The *Miller* Court noted that, from the jury's perspective, the case involved the issue of damages, if any, arising from the underlying tort action. *Id.* at 185, 553 A.2d 1268. When the jury returned a verdict in excess of the uninsured third party policy limits, Allstate argued that the verdict

should be reduced to the amount of the policy limits. Miller disagreed, claiming Allstate failed to introduce the policy limits and therefore it could not do so after the verdict. The Court disagreed, stating:

> [Miller's] argument might be persuasive had this case gone to the jury on the contract claim against Allstate. But, as we have seen, what actually went to the jury was the question of damages arising from the tort claim of Miller against Sowell. *We are dealing with what was functionally presented to the jury as a tort case.*

*Miller*, 315 Md. at 190, 553 A.2d 1268 (emphasis added).

The *Miller* Court added:

> *[T]he amount of uninsured motorist coverage should not be disclosed unless the amount is in controversy.*

> \* \* \*

> *[W]hat the jury was directed to consider, and all the jury was directed to consider, was the issue of damages in a tort case.* In this posture of the case, and under these circumstances, rather than require a party to establish uninsured motorist policy limits as an affirmative defense or as a limitation of exposure, *the better rule is to allow the jury to make its decision on the issue of damages without being informed of the amount of coverage available.* Therefore, the admission of uninsured motorist coverage amounts should not be a tactical decision left to the parties' discretion. *The fact of the limit of uninsured motorist coverage is irrelevant to the issue of the amount of tort damages.*

*Id.* at 191–92, 553 A.2d 1268 (emphasis added)(footnote omitted).

In the case *sub judice*, appellants never urged the trial court to inform the jury of the amount of coverage available under American's policy. Therefore, neither *Farley* nor *Miller* is directly on point.

■ As in *Farley* and *Miller*, however, this case clearly proceeded as the functional equivalent of a tort case. Appel-

lants sought tort damages from their Insurer, and the trial court presented the jury with instructions consistent with a tort case. But, unlike in *Miller* and *Farley*, the question presented here concerns the adequacy of the jury instructions, given that the jury was aware that appellants had already recovered some unknown sum of damages from Sites as the tortfeasor.

As we see it, this case illustrates the colloquialism that a little bit of knowledge can be a dangerous thing. There is no question that the jury was informed that appellants had already recovered some money from Sites, and that the Boones were not satisfied with the amount of that recovery. The jury was also told that, as a result of that dissatisfaction, appellants brought an underinsurance claim against American, their own Insurer. On more than one occasion, the court attempted to explain the concept of underinsurance to the jury. Indeed, in its final jury instructions, the court twice told the jurors that appellants pursued their claim against American because of the alleged "deficit" with regard to appellants' recovery from the tortfeasor.

Nevertheless, what the jury was not told was quite important to an accurate understanding of the matter. The jury was not told that the sum previously recovered by appellants from Sites would be deducted from the amount of any award of damages. The jury's ignorance as to that matter certainly could have affected its understanding of the value to appellants of any damages that it awarded. Given appellee's concession that the accident was a serious one, however, it seems unlikely that the jury realized that it was actually awarding nothing to appellants. Yet, that is the consequence of what occurred.

To be sure, the court and appellee's counsel told the jury to award just compensation to appellants. The jury was also told not to speculate about the sum already recovered from Sites by appellants. Nevertheless, looking at the case as a whole, the jury could well have thought that the damages it awarded were in addition to the unspecified sum already recovered by

appellants from Sites, and not subject to a reduction equal to the sum already recovered from the tortfeasor.

We recognize that a countervailing argument could be made that the jury knew its award was not a mere supplement, and it understood it was to arrive at the amount of appellants' damages, as if no other recovery had been obtained. This argument carries some plausibility, because it would be difficult for a jury to determine the appropriate amount of a supplemental award without knowing what precise sum it was supplementing.

The uncertainty as to what the jury intended persuades us that the instructions were incomplete; the court did not clearly advise the jury to assess damages as if no other recovery had been obtained by the Boones. Instead, the jury may have been confused as to how it was to calculate damages.

Certainly, if the jury had never known of appellants' recovery from the tortfeasor, it would have awarded the total damages it believed appropriate, and the court then could have made any necessary deductions from the jury's award. Yet, because the jury knew of appellants' prior recovery from Sites, there is ambiguity with respect to the interpretation of the damages awarded by the jury. We cannot determine with assurance whether the sum awarded represented the jury's assessment of the total amount of damages, or instead, whether the verdict represented the jury's desire to supplement the "deficit."

The confusion underscores that it was incumbent upon the trial judge to fashion an instruction that made clear to the jury how it was to proceed in assessing damages. In this regard, what we said in *Green v. State,* 119 Md.App. 547, 562, 705 A.2d 133 (1998), is apt. "When the evidence generates an issue that is not covered by a pattern instruction, we must count on the court to incorporate relevant and valid legal principles gleaned from the case law."

In our view, the court could have considered several variations with respect to appellants' proposed Instruction 7B. For

example, the court could have told the jury that it was to award the total amount of damages, if any, that it believed appellants were entitled to recover, as if the Insurer were the sole tortfeasor. Alternatively, the court could have made plain to the jury that it was to assume that no money was ever recovered by appellants from Sites, and then award appellants whatever sum, if any, the jury believed represented appellants' total damages. In other words, the court could have explained to the jury that, in making an award of damages, it was to disregard any other monetary recovery obtained by appellants, and make an award as if no other sum had been obtained by appellants. Or, the court could have informed the jury that its award of damages, if any, was not meant to serve as a supplement to the recovery obtained from Sites; therefore, the jury was to award the full and total amount the jury deemed appropriate. The court also could have told the jury that it would deduct from any damages awarded by the jury the amount that appellants already recovered from Sites, so as to prevent a double recovery by appellants. Alternatively, the court could have told the jury to make an award of the full and complete amount that it believed appellants were entitled to receive, without regard to any other sum appellants may already have collected, because the court would not permit a double recovery.

As a result of the court's failure to make clear to the jury how it was to proceed, the jury may have believed it was awarding appellants $15,864.48 as a supplement to whatever amount appellants had already recovered from Sites. Therefore, we shall vacate the judgment and remand for further proceedings.

In light of our ruling, we need not address appellants' other contentions, as they are not likely to recur on remand.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE.**